[Crim. No. 9126. In Bank. Apr. 27, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JOSHUA NICHOLAS HILL and JAMES WILLIAM SAUNDERS, Defendants and Appellants.

Burton Marks and Richard G. Sherman, under appointment by the Supreme Court, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

SULLIVAN, J.—Defendants Joshua Nicholas Hill, James William Saunders and Ben Madorid were charged in count one of an information with murder (Pen. Code, § 187)[1], in

---

[1]Hereafter, unless otherwise indicated, all section references are to the Penal Code.

count two with assault with intent to commit murder (§ 217) and in count three with robbery (§ 211).[2] A jury found all three defendants guilty as charged and further found the murder and robbery to be of the first degree. (§§ 189, 211a.) Following the penalty trial on the murder count, Hill and Saunders were sentenced to death and Madorid to life imprisonment. The appeals of Hill and Saunders are automatic (§ 1239, subd. (b)). Madorid has not appealed.

About 11 p.m. on September 16, 1964 (Wednesday) Adolph Rothman, a clerk, was in charge of the Laurbank Liquor Store in North Hollywood. With him at the time was a friend, Harry Wosk, who frequently visited Rothman at the store when the latter was on duty. The two were engaged in a card game on the counter when defendants Hill and Madorid entered the store. Rothman came forward to wait on them and defendants asked for a bottle of whiskey and a six-pack of beer. At this point another customer came into the store, whereupon defendants told Rothman to wait on him first.

After the customer left, Rothman brought the whiskey and beer to the counter and asked defendants for an identification. Hill produced a draft card, but Rothman said "It is no good," and winked at Wosk, indicating that the latter should come over and take the beer back to the refrigerator. Wosk did so and Rothman turned around to put the whiskey back on a shelf. While Rothman's back was turned, Hill pulled a gun from under his sweater and shot Rothman in the back of the head, killing him. Wosk turned to see what had happened and was hit in the cheek by Hill's second shot. He fell to the floor severely wounded as Hill and Madorid turned to the cash register. They took $152 in bills and coins, walked from the store to a waiting car, and were driven away by defendant Saunders.

On the next evening (Thursday) Hill and Saunders showed Madorid's roommate, one John Niehoff,[3] the newspaper account of the robbery, said that Hill and Madorid were the persons being sought and forced Niehoff to drive the group, including Madorid, to Las Vegas. The four arrived in Las Vegas about 8 a.m. Friday, September 18, and parked near a

[2]Hill and Saunders alone were charged in count four with kidnapping (§ 207). On motion of said defendants this count was severed.

[3]Niehoff was the owner of the car driven by Saunders at the scene of the crime. He had rented the car to Saunders on the previous night after Saunders had represented that he needed it that night for business purposes.

casino. Pretending to look for a friend, Niehoff was successful in separating from the others and informed a security guard at the casino of the situation, who in turn called the police. Within a short time Niehoff and the three defendants were arrested by Las Vegas police.

The three defendants were placed in separate interrogation rooms at the police station about 9 a.m. and were seen in turn by Detective Sergeant Manning of the Las Vegas Police Department. They were then being held for ''fugitive California.'' Sergeant Manning informed each man that he was under arrest as a fugitive from California in regard to a robbery-murder occurring at a Hollywood liquor store. Each was advised that he had a right to contact an attorney prior to making any statement, that he did not have to make a statement and that any statement he did make could be used in court against him. Each was then asked to make a statement and each refused. None of them requested an attorney. They were then taken to the city jail, located in the same building, and booked on a charge of ''fugitive California.'' Las Vegas police officers made no further attempts to interrogate them.

On Friday evening (September 18) Los Angeles Police Sergeants Smith and Gerber arrived in Las Vegas to continue the investigation of the case. They questioned Niehoff that night but made no attempt to talk with the three defendants.

On Saturday morning (September 19) they spoke with each of defendants separately, starting with Madorid. In Smith's presence Gerber advised Madorid that he was entitled to an attorney, that he need not make any statement and that if he did, it could be used against him in court. Madorid then made a full disclosure of the facts of the case within his knowledge, which in substance were as already detailed herein. The statement was tape recorded and a transcript of the recording was read into evidence at the trial.

Defendant Saunders, after being similarly advised as to his constitutional rights, said that he wanted to see an attorney before answering certain questions that had been put to him. He was asked whether he had an attorney and, when he replied in the negative, he was told to make his request to Las Vegas Police Lieutenant Handlon who was then present. According to Smith, instead of making a request Saunders asked for California law books, explaining ''I just want to know what the law is.'' He was informed that there were no California law books available. Gerber offered to explain the

California law to him but defendant persisted in his request. Gerber and Handlon then left the room to look for Nevada law books which might be similar and "that ended the attorney discussion." Finally, an old copy of the California Penal Code was produced. Defendant did not examine it.

At this point Sergeant Smith told Saunders that they had certain information which "he was entitled to know" and proceeded to outline to the latter the essential facts of the liquor store robbery and homicide. In so doing he used in part information acquired from both Niehoff and Madorid. He did not, however, tell Saunders that Madorid had given a statement.

At the conclusion of this narrative, Saunders said that he wanted to make a statement. Smith again advised him of his constitutional rights. The sergeant then printed the following on a piece of paper and had Saunders read it aloud: "Las Vegas Police Department, 400 North First Street, Las Vegas, Nevada. September the 19th, 1964, 12:20 p.m. Prior to this statement I was advised of my Constitutional rights by Sergeant R. T. Smith, Los Angeles Police Department in the presence of Sergeant Gerber and Lieutenant B. J. Handlon of the Las Vegas Police Department. These rights are, namely, that I am entitled to an attorney prior to giving any statement. A right to remain silent and, with the knowledge that anything I may say can be used against me in a court of law. I make this statement freely and voluntarily in order that the truth be known. No one has used any force or threats of force to induce this statement, nor has anyone made me any promises of reward or lesser sentence." After Saunders had finished reading he wrote out the following statement on the same piece of paper under the portion printed by Smith: "On the night of Wednesday, 16, September, I, James W. Saunders, drove the two said parties, Vito [defendant Hill] and Ben to a liquor store on Laurel Canyon Boulevard with the intent of purchasing beer. I parked around the corner. Ben and Vito went in and came out. We then went back to Ben's apartment. There was shown a considerable amount of small bills. At this point, I learned the store had been robbed. I was offered a small amount." The document was signed: "James W. Saunders, September the 19th, 1964, 12:45 p.m." Smith, Gerber and Handlon all signed their names as witnesses. The above statement was obtained about 15 to 30 minutes after Saunders first asked for an attorney.

546

That afternoon (Saturday) Smith questioned defendant Hill in the presence of Officer Gerber and Lieutenant Handlon, first informing Hill as to his constitutional rights in substantially the same manner as he had advised Madorid and Saunders. Hill spoke freely and voluntarily but made no confession or admission during the interview although Smith overheard Hill say to Gerber, "I believe I have committed a heinous crime." Hill at no time said that he did not want to talk about the case.

On Saturday evening (September 19) Sergeants Smith and Gerber returned to Los Angeles taking Niehoff with them. The latter was released on Monday, September 21. On Monday the officers obtained a warrant for defendants' arrest, and returned to Las Vegas on Tuesday (September 22). That afternoon the Los Angeles officers brought all three defendants together at the Las Vegas jail for a "group conversation." Sergeant Smith then had Madorid repeat the statement he had already related to the officers. Saunders' response was a reiteration of his earlier written statement. Hill's response was "It sounds like Grimm's fairy tales to me."[4]

That night (Tuesday) all three defendants were brought to Los Angeles and taken to the North Hollywood police station where they were booked about 11 p.m. Sergeant Smith asked Hill whether he wished to call or notify anyone but the latter said that he did not. Smith then left. Two other officers, Sergeants Melendey and Sandoval, began an interrogation of Hill as to an unsolved murder of one William Virjin. This interrogation continued until after 5 a.m., extending over a period of approximately six hours, and included the voluntary taking of a polygraph examination by Hill. The latter testified at trial that he finally confessed to the Virjin murder because the interrogating officers promised him immunity from prosecution in regard to it; Sergeant Melendey contradicted this. In any event, it is clear that some time during the course of the long interrogation on the Virjin matter defendant Hill confessed to that crime.

At 11 a.m. on September 23 (Wednesday) Sergeant Smith reappeared and took defendant Hill to a lineup. After the lineup Hill was put in an interrogation room at the North Hollywood station. Smith left the room, leaving Hill with Sergeant Lee. Unknown to Hill, a tape recorder was running. According to Smith, Hill at this point sent for him and said

---

[4]Defendant Saunders was also known as "Frankie Grimm."

"I want to tell you the story." Smith "readvised" him of his constitutional rights. Hill then made a full confession which was in substantial agreement with the confession given by Madorid in Las Vegas. In the course of this statement, Hill said that he killed Rothman, the liquor store clerk, because "he had too good a look at me." As indicated above, the statement, unknown to Hill, was tape recorded. Immediately upon its completion, a second statement covering substantially the same material was tape recorded with Hill's consent. At the trial both recordings were played to the jury.

Defendants were arraigned in the municipal court in Van Nuys at 1:30 p.m. on September 23, 1964—approximately five days after their arrest in Las Vegas. On the way to the arraignment a police officer inquired of Saunders: "Well, Frankie Grimm, all the rest of the boys have told the truth about this story or situation; what about you?" Saunders then admitted that he had known that a robbery was contemplated when he drove Hill and Madorid to the liquor store and waited for them, and that he had shared in the proceeds of the robbery. Saunders was not advised of his constitutional rights immediately prior to giving this statement, but he spoke freely and voluntarily and without the application of prompting or pressures of any kind.

At the trial on the issue of guilt, defendant Madorid took the stand in his own behalf. Neither Hill nor Saunders testified. Excepting Madorid's testimony, none of the defendants introduced any evidence in defense.

Defendants Hill and Saunders are represented on this appeal by separate counsel appointed by this court. Hill's present counsel did not represent him at the trial; Saunders' present counsel did represent the latter below. Separate briefs for each defendant have been filed with us. We therefore propose to consider together, so far as we can conveniently do so, the common points on appeal raised by both defendants and to indicate, in other instances, where the point is raised by either defendant alone.

We first turn to defendants' contentions to the effect that their statements given to the Los Angeles police were inadmissible because they were involuntary and obtained in violation of their constitutional right to counsel. Our following discussion considers these two attacks in the order indicated above.

Defendant Saunders contends that the written statement made by him on September 19, 1964, while still in Las Vegas

and the later statement made on September 23, 1964, in the patrol car on the way to his arraignment were involuntary because they were induced by a promise of leniency or advantage. His claim as to the earlier statement rests on an argument that Sergeant Smith urged him to consider his own position as against that of his codefendants and, in effect, to desert a sinking ship and "grab a life-saver" if he could, as he might expect his codefendants to do. His claim as to the later statement rests upon an argument that it was the result of the same influence which allegedly vitiated the statement of September 19.

As already pointed out, Sergeant Smith also told the defendant what the authorities had learned concerning the crime at that point and, so far as appears, gave Saunders no false information. The record fails to disclose that any of the officers present made any threat or promise of leniency, although they urged that Saunders "help himself." Thereafter Saunders made the written statement heretofore set out wherein he acknowledged that "No one has used any force or threats of force to induce this statement, nor has anyone made me any promises of reward or lesser sentence."

Saunders relies on *People* v. *Brommel* (1961) 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845], where we said: "The cases in this court are clear from the earliest time that any promise made by an officer or person in authority, express or clearly implied, of leniency or advantage for the accused, if it is a motivating cause of the confession, is sufficient to invalidate the confession and to make it involuntary and inadmissible as a matter of law." In analyzing the officer's conduct there, we observed at pages 633-634: "The latter part of this statement was both a threat, that unless defendant told the officers what they wanted and were insisting that he tell them they would write 'Liar' on the statement and that defendant could then expect no leniency from the court; and an implied promise, that if defendant told the officers the story that they were insisting that he tell them they would not write 'Liar' on the document and defendant might expect a 'break' from the court."

The People urge that *Brommel* does not help Saunders, and that the instant circumstances closely parallel those appearing in and are governed by *People* v. *Ditson* (1962) 57 Cal.2d 415 [20 Cal.Rptr. 165, 369 P.2d 714], where we said in upholding the admission of the defendant's statement in that case: "But absent something other than mere questions, or exhorta-

tions to tell the truth or clear his conscience or help himself by revealing facts as to the dominant part of [a codefendant] or some other person in the criminal enterprise, there appears to be nothing on the face of the record which would support a finding of overreaching or coercion. . . . We recognize, of course, that coercion can be psychological as well as physical. But in this we must exercise great care not to become confused: intellectual persuasion is not the equivalent of coercion.'' (57 Cal.2d at p. 433.)

■ The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. ■ Thus, ''advice or exhortation by a police officer to an accused to 'tell the truth' or that 'it would be better to tell the truth' unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary.'' (*People* v. *Nelson* (1964) 224 Cal.App.2d 238, 250 [36 Cal.Rptr. 385], and citations appearing there.) In *Ditson,* for instance, the language of inducement, held not to render the ensuing confession involuntary, was as follows: '' 'I'm not telling you I'm going to help you. I'm not promising you anything. I'm telling you, Carlos, help yourself. . . . Don't you see what I'm trying to do for you? . . . I want you to help yourself. I'm not promising you anything. . . .' '' (*People* v. *Ditson, supra,* 57 Cal.2d 415, 432, fn. 5 (petition for writ of cert. dismissed 371 U.S. 937 [9 L.Ed.2d 273, 83 S.Ct. 311]) ; see also, *People* v. *Nelson, supra,* 224 Cal.App.2d 238, 245, fn. 3.)

■ When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. ■ The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear. (See *People* v. *Thompson* (1890) 84 Cal. 598, 605-606 [24 P. 384] ; *People* v. *Barric* (1874) 49 Cal.

550

342, 344-345; *People* v. *Leavitt* (1929) 100 Cal.App. 93, 95 [279 P. 1056]; cf. *People* v. *Nelson, supra,* 224 Cal.App.2d 238, 251.)

■ In the instant case the record fails to disclose that any improper inducements were held out to Saunders. The officers only pointed out those benefits which would naturally accrue to him if his true role in the crime was made known, but such benefits did not include leniency or favorable treatment by the state. The officers made no express or implied promises of leniency or other advantage obtainable from the authorities because of, or in return for, a statement. We conclude that neither of Saunders' statements was involuntary because of any improper inducements made to him by the police.

Both defendants contend that their respective statements made in Los Angeles on September 23, 1964, were involuntary because they were obtained during a period of unlawful detention. The point of their claim is that although arrested in Las Vegas on Friday, September 18, 1964, defendants were not brought before a magistrate in California until Wednesday afternoon, September 23, 1964, or after a five-day delay allegedly in violation of sections 825[5] and 849.[6] It is argued that the delay was unnecessary since defendants and Madorid had signed waivers of extradition; that Sergeant Smith should have brought all of them back to California on Saturday, September 19, 1964, when he returned with Niehoff; that Saunders was not taken before a magistrate in Las Vegas on Friday when he was arrested, or on the following Monday and Tuesday, during which time he was in the Las Vegas jail "under constant interrogation"; and that Hill in the intervening time was held incommunicado. We find no merit in any of the foregoing.

■ The record reflects no unnecessary delay in taking defendants before a magistrate. When the Los Angeles police arrived in Las Vegas on Friday evening (September 18) they

---

[5]Section 825 provides: "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays; provided, however, that when the two days prescribed herein expire at a time when the court in which the magistrate is sitting is not in session, such time shall be extended to include the duration of the next regular court session on the judicial day immediately following."

[6]Subdivision (a) of section 849 provides: "When an arrest is made without a warrant by a peace officer or private person, the person arrested, if not otherwise released, must, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the offense is triable, and a complaint stating the charge against the arrested person, must be laid before such magistrate."

did not yet have sufficient evidence to file a complaint against defendants in California. Having acquired adequate information as a result of questioning Niehoff on Friday evening and the three defendants on Saturday, the officers returned to Los Angeles on Saturday evening. On Monday, the next business day, Sergeant Smith had a complaint filed and obtained warrants for defendants' arrests. He returned to Las Vegas with the warrants on the following day, Tuesday, and forthwith brought defendants to Los Angeles that evening. They were taken before a magistrate for arraignment the following day, Wednesday, at 1:30 p.m. which was the earliest hour on that day for arraignments in the particular court.

Since it appears that defendants were arraigned on the very next day following their return to Los Angeles, we have no hesitancy in concluding that they were taken before the magistrate without unnecessary delay and certainly well within the two-day period specified in section 825. (See *People* v. *Mitchell* (1962) 209 Cal.App.2d 312, 320 [26 Cal.Rptr. 89].) ■ We cannot regard this interval of time to have been enlarged by the preceding period during which defendants were detained outside of California, particularly since the Los Angeles police in our view acted with all reasonable dispatch in going to Las Vegas, questioning the suspects, returning to Los Angeles to secure warrants, and finally making a second trip to Las Vegas to take defendants into their custody. While Saunders had signed a waiver of extradition on Saturday, Hill did not sign one until just before leaving for Los Angeles on Tuesday. Notwithstanding Saunders' waiver of extradition, there was nothing improper in the decision of Sergeant Smith and his brother officers to return to Los Angeles and follow, without unreasonable delay, the regular procedure of obtaining arrest warrants for all three defendants. We find no unlawful detention.

■ Even assuming *arguendo* that these activities of the police resulted in unnecessary delay, "A violation of a defendant's right to be taken before a magistrate within the time specified by the law does not require a reversal unless he shows that through such wrongful conduct he was deprived of a fair trial or otherwise suffered prejudice as a result thereof. [Citations.]" (*People* v. *Combes* (1961) 56 Cal.2d 135, 142 [14 Cal.Rptr. 4, 363 P.2d 4].) It does not appear that by reason of the delay defendants were deprived of a fair trial or otherwise prejudiced.

Defendant Hill further contends that because certain

officers interrogated him into the early morning of September 23, 1964, concerning the Virjin matter, the confession of the instant crimes which he made later that day was involuntary and should have been excluded. Hill apparently contends that coercive tactics, including the late hours in connection with the Virjin interrogation, must also be considered as applicable to his confession in the instant matter some seven hours later. Apart from the late hour of the interrogation being a possible factor, the record fails to reveal that coercion of any kind was employed during the questioning on the Virjin matter. There were no threats or exhortations to tell the truth, nor promises of immunity or leniency, according to the testimony of the officers present. What coercive atmosphere could have been somehow transferred from the Virjin interrogation to the gratuitous offer to make a statement regarding the instant matter some seven hours later, does not appear. █ Certainly, at the time the instant statement was made Hill had had ample opportunity to rest, was in full possession of his faculties and was not subjected to or suffering from any physical or psychological pressures. It was, accordingly, a voluntary statement.

We now turn to defendants' claims that, quite apart from the question as to whether or not the statements were voluntary, in any event their admission in evidence constituted reversible error under the rules announced in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado* (1964) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Hill argues that if advice as to constitutional rights was given at all, it was "done tongue-in-cheek, as a hollow rote to be recited and disregarded." Saunders' position is that, after he was advised of his rights and thereupon asked for an attorney before he would say anything, any subsequent statements made by him "were made in violation of his constitutional right to counsel . . . ."

█ First, we observe that defendants' trial began before June 13, 1966, the date of the decision in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. We therefore apply *Escobedo* and *Dorado*, rather than *Miranda*, to the instant case. (*People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].) In the light of these applicable rules, we find no merit in either claim.

█ The record furnishes ample support that Hill was properly advised, on numerous occasions, prior to his state-

ment on September 23, 1964. He was first advised in Las Vegas before the Los Angeles police arrived and again after they arrived. Upon returning to Los Angeles he was given opportunity to call an attorney. When he volunteered to tell his story on September 23, he was again advised of his right to counsel and his right to remain silent, and, additionally, that anything he might say could be used against him. The record furnishes ample support that Hill understood his rights and elected nevertheless to proceed to make his statement. At no time did he request an attorney, and, although he claims he was denied the right to make telephone calls, the record reveals only that he refused offers to use the telephone when made to him. In view of the adequate warnings as to his constitutional rights, the court properly received in evidence the statement of September 23. (*People* v. *Luker* (1965) 63 Cal.2d 464, 473 [47 Cal.Rptr. 209, 407 P.2d 9].)

As to the statement of Saunders, made on September 19, 1964, it appears that earlier on that day Saunders requested the assistance of an attorney after being advised of his right thereto. He was referred by the Los Angeles officer, to whom the request was made, to the Las Vegas police in connection with his request, but he did not pursue the matter although a Las Vegas police officer was then present. Instead he asked for books of California law, but did not make use of the only book available to him. Discussions were had but no questions were asked of him until he indicated that he wished to make a statement and, after again being advised of his rights, the written statement, hereinbefore quoted and exculpatory in nature, was made and signed by him.

Where the authorities ignore a request for counsel and continue an interrogation, the right of counsel has been denied. (*People* v. *Luker, supra,* 63 Cal.2d 464, 474.) However, there is no reason why, once having requested counsel and the request having been recognized by a cessation of interrogation, the accused cannot elect to proceed without counsel if that election is freely, knowingly and intelligently made. Such appears to be the present case (cf. *People* v. *Anderson* (1965) 63 Cal.2d 351, 361-362 [46 Cal.Rptr. 763, 406 P.2d 43]), and no claim is made that Saunders was not aware that he had waived his earlier request for the assistance of counsel. In his written statement he acknowledged that he was aware that he was entitled to an attorney; that the statement could be used against him, and that he made the

statement "freely and voluntarily in order that the truth is known."

An *Escobedo-Dorado* violation is also claimed in connection with the statement by Saunders on September 23, while in the patrol car on the way to the arraignment with the other defendants. Although that statement was not immediately preceded by a warning of Saunders' constitutional rights, he had been so advised on several occasions after his arrest. The issue thus presented is whether, in making the September 23 statement, Saunders was then sufficiently aware of his constitutional rights to be deemed to have knowingly and intelligently waived them. (See *People* v. *Stewart* (1965) 62 Cal.2d 571, 581 [43 Cal.Rptr. 201, 400 P.2d 97].)

Saunders was advised of the constitutional rights in question on at least four occasions—once by the Las Vegas police shortly after his arrest on September 18, again upon his first interview with the Los Angeles police the following day, a third time by the Los Angeles police when Saunders stated he wanted to make his September 19 statement, and a fourth time shortly thereafter when he signed that statement containing a recital of his rights. The impact of this latter warning is particularly significant, as Saunders read aloud those portions of the written statement concerning his rights, each of which was separately stated, before signing. The foregoing warnings were given at a time and under circumstances which permitted Saunders to consider their significance and reflect on the advisability of an exercise or waiver of those rights. He was, in fact, once advised of the procedure for making an attorney available but instead requested a law book. Nothing occurred between the time of the last admonition and the statement of September 23, including the running of the time involved, which can be construed to have reasonably affected Saunders' understanding of his rights, and he makes no claim of a lack of understanding at the time he responded to the invitation to tell "the truth" on September 23. We are satisfied that the record demonstrates that the "accused was offered counsel but intelligently and understandingly rejected the offer." (*Carnley* v. *Cochran* (1962) 369 U.S. 506, 516 [8 L.Ed.2d 70, 77, 82 S.Ct. 884] ; cf. *People* v. *Lilliock* (1965) 62 Cal.2d 618, 622 [43 Cal.Rptr. 699, 401 P.2d 4].) His waiver is thus manifest.

We next consider the complaint made by both defendants that the court erred in not instructing the jury that Madorid was an accomplice as a matter of law. During the trial both

Hill and Saunders exercised their privilege not to testify, but Madorid took the stand and testified fully as to the matters set out here in the foregoing recital of facts. His testimony constituted a judicial confession as to him and, standing alone, implicated Hill and Saunders sufficiently to support their convictions if properly presented to the jury.

Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." The court instructed the jury that if it found the crimes charged to have been committed, "and if you further find that defendant Madorid was an accomplice . . . , then as against codefendants Hill and Saunders, his testimony must be corroborated." The court further instructed that the jury was to apply general rules of credibility when weighing Madorid's testimony in his own defense, but in weighing that testimony "as against his codefendants, you ought to view it with distrust."

Defendants both claim that the court erred in instructing the jury in a manner which permitted it to conclude that Madorid was not an accomplice, and thus avoid the necessity of finding corroboration, when it appears and the jury should have been so advised that Madorid was an accomplice as a matter of law. ▮ It fairly appears that Madorid was an accomplice as a matter of law. He was charged with the identical crimes, and all the evidence placed him in the company of Hill and Saunders in the commission of those crimes. (See *People* v. *Ferlin* (1928) 203 Cal. 587, 601 [265 P. 230].) ▮ However, where a codefendant has made a judicial confession as to crimes charged, an instruction that as a matter of law such codefendant is an accomplice of other defendants might well be construed by the jurors as imputing the confessing defendant's foregone guilt to the other defendants. (*People* v. *Richardson* (1960) 182 Cal.App.2d 620, 623 [6 Cal.Rptr. 61].) It is not error even to forego the giving of accomplice instructions where the giving of them would unfairly prejudice a codefendant in the eyes of the jury. (See *People* v. *Catlin* (1959) 169 Cal.App.2d 247, 254-255 [337

P.2d 113].) ▮ In the instant case it was not error to leave to the jury the determination of Madorid's role as an accomplice and thus avoid imputations of the guilt of Hill and Saunders which might have flowed from the court's direction that the confessing Madorid was their accomplice as a matter of law.

In any event, no prejudice could have resulted as the jury found Madorid guilty of the identical crimes as Hill and Saunders. ▮ Thus, it clearly found him to be an accomplice (*People* v. *Richardson, supra,* 182 Cal.App.2d 620, 623), and we may presume that it followed the proper instructions to find corroboration (*People* v. *McDermott* (1925) 75 Cal. App. 718, 720 [243 P. 485]). ▮ Furthermore, there is substantial corroborating evidence, consisting of the defendants' extrajudicial statements applicable to them individually, the testimony of Wosk and other persons who saw Hill in the liquor store and the testimony of Niehoff who rented the car to Saunders on the evening of the crime and thereafter was forced to drive defendants to Las Vegas while they freely discussed the matter. The foregoing more than satisfies the requirement of section 1111 since "corroborative evidence may be slight and entitled to little consideration when standing alone." (*People* v. *Wade* (1959) 53 Cal.2d 322, 329 [1 Cal.Rptr. 683, 348 P.2d 116]; see also *People* v. *Wayne* (1953) 41 Cal.2d 814, 822 [264 P.2d 547].)

Both defendants contend that evidence of a robbery in San Fernando Valley committed by them three nights prior to the robbery of the Laurbank Liquor Store was inadmissible. The prior robbery, also of a liquor store, was at 11 p.m., the clerk was asked to bring bottled goods to the counter, was then maneuvered into a position where he could be attacked from behind, was struck on the head and shot in the leg by Hill, and the cash register was emptied by Saunders. The clerk in that case was ordered by Hill to turn around as defendants were about to depart the scene, but he refused to do so.

▮ As a general rule evidence of other crimes is inadmissible when offered solely to prove criminal disposition or propensity to commit the crime charged, because the probative value of such evidence is outweighed by its prejudicial effect. (*People* v. *Kelley* (1967) ante, p. 232 [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *Westek* (1948) 31 Cal.2d 469, 476 [190 P.2d 9].) ▮ However, evidence which is otherwise relevant "is not excluded because it reveals the commission of an offense other than that charged" (*People* v. *Peete* (1946)

28 Cal.2d 306, 315 [169 P.2d 924]) where "it tends logically, naturally, and by reasonable inference, to establish any fact material for the People or to overcome any material matter sought to be proved by the defense" (*People* v. *Kelley, supra, ante,* pp. 232, 239; see also *People* v. *Peete, supra,* 28 Cal.2d 306, 315). It is settled that evidence of other crimes is ordinarily admissible despite the prejudicial effect where it tends to establish guilty knowledge, motive, intent, or presence of a common design or plan. (*People* v. *Westek, supra,* 31 Cal.2d 469, 480.)

In view of the striking similarities in the methods of operation in the instant and the earlier San Fernando robberies, the evidence of that earlier robbery was clearly admissible. In each instance the place robbed was a liquor store, the robbery was committed at approximately 11 p.m., the clerk was first asked for some bottled goods, a gun was then used to intimidate the victim, he was assaulted from behind by one robber and the contents of the cash register was taken by a second robber. The evidence was relevant to show a common plan or scheme and thereby knowledge on the part of Saunders as to the modus operandi and probable consequences in the case at bench. (See *People* v. *Coefield* (1951) 37 Cal.2d 865, 870 [236 P.2d 570].) Accordingly, no error occurred.

Saunders next contends that the admission of the various statements of his codefendants prejudiced him because the trial court refused to delete his name from the statements of the other defendants. (See *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]; *People* v. *Marbury* (1965) 63 Cal.2d 574 [47 Cal.Rptr. 491, 407 P.2d 667].) Defendant Hill contends for similar reasons that it was a denial of due process of law to permit the use of the confessions of Madorid and Saunders to the extent that such confessions implicated Hill.

The People concede, even though the court instructed thoroughly that evidence admitted against one defendant was not to be considered against the others, that under rules later announced by this court the trial court nevertheless erred in admitting those portions of each statement which implicated a codefendant. (*People* v. *Aranda, supra,* 63 Cal.2d 518, 530-531.) The People also concede that the proper procedure in the instant case would have been to sever and try the defendants separately in the absence of a willingness on the part of the prosecution to proceed without the confession evidence.

*Aranda* declares that there must be a severance where effective deletions of a statement implicating a codefendant cannot be made and the prosecution offers or proposes to offer such statement in evidence. (63 Cal.2d 518, 530-531.) In the instant case related, consistent confessions by each of three defendants were offered. Each confession seriously implicated the declarant's codefendants. If such implicating portions of the confession were deleted, it nevertheless appears that each of them could have been substantially reconstructed by the trier of fact because of their interlocking nature. In short, effective deletions were not possible and, under *Aranda*, separate trials should have been had.

In *People* v. *Charles, ante,* p. 330 [57 Cal.Rptr. 745, 425 P.2d 545], we hold that the rules of *Aranda* are available to defendants, as in the case of the instant defendants, whose judgments of conviction are still pending upon appeal. The question thus presented is whether the error in the imposition of a joint trial with the improper disclosure of their codefendants' confessions was prejudicial to either Hill or Saunders. (See *People* v. *Charles, ante,* pp. 330, 337-338 [57 Cal.Rptr. 745, 425 P.2d 545]; *People* v. *Gilbert* (1965) 63 Cal.2d 690, 702 [47 Cal.Rptr. 909, 408 P.2d 365].) In *Aranda* we said: ". . . the fact that the confession is only an accusation against the nondeclarant and thus lacks the shattering impact of a self-incriminatory statement by him [citation] preclude[s] holding that the error of admitting the confession is always prejudicial to the nondeclarant." (63 Cal.2d 518, 526-527.)

In view of the other competent and overwhelming evidence against both Hill and Saunders, the codefendants' confessions could not have had any reasonable bearing on the convictions. Hill's confession of September 23, individually admissible against him, shows the depraved and senseless manner in which he elected to kill his victim. Saunders' statements of September 19 and particularly of September 23, when considered with other direct and circumstantial evidence independent of his codefendants' extrajudicial statements, admittedly constitute a confession and clearly establishes his guilt under the felony-murder doctrine. (See *People* v. *Charles, ante,* pp. 330, 338 [57 Cal.Rptr. 745, 425 P.2d 545].) In addition to the confessions, Madorid's testimony of the participation of each defendant in the crimes was incriminating and substantial. Niehoff testified as to the very incriminating conduct and statements made by defend-

ants while he was forced to drive them to Las Vegas, and Mr. Wosk and other persons testified concerning Hill's and Madorid's conduct at the liquor store.

When the impact of the foregoing is weighed against the codefendant confessions, vitiated by the trial court's instructions that the jury should not consider them as evidence against the nondeclarants (see *People* v. *Gilbert, supra,* 63 Cal.2d 690, 702), we must conclude that there is no reasonable probability that the jury would have returned a more favorable verdict for either Hill or Saunders if, as required by *Aranda,* they had been tried separately. (Cal. Const., art. VI, § 13; ▌ *People* v. *Charles, ante,* pp. 330, 332 [57 Cal.Rptr. 745, 425 P.2d 545]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) A reversal as to either defendant thus cannot be predicated on this ground.

We turn to consider three specifications of misconduct on the part of the prosecutor which Saunders charges occurred during the closing argument to the jury on the penalty phase of the trial. We shall consider the first two specifications together.

At the opening of his rebuttal argument the prosecutor remarked on the choice of names, ''Frankie Mancuso'' and ''Vito Cellini,'' used by Saunders and Hill respectively, as intended to make them ''sound a little tougher.'' Thereafter the prosecutor continued: ''We would like to know why they took those names and I would have asked Mr. Saunders had he taken the stand, for that purpose. I would have asked him a lot of other things, too. I would have asked Frankie, 'What kind of collection were you going to go out on that night when you told Niehoff that you had to borrow a car.' '' After an objection was made and overruled, the prosecutor continued: ''At least, Madorid walked the steps and got up there and told you, 'I am sorry': nothing else but 'I am sorry.' Did Frankie say that? Ladies and gentlemen, I would have asked him, 'Why did you take the name Mancuso? Why did you change your name? What about it? Where did you come from? What were you doing?' ''

The prosecutor, apparently in an attempt to explain what had prompted him to make his remarks, then stated as follows: '' [Counsel for Saunders] tells you that the D.A. could have gone into certain questions when Mr. Saunders was on the stand on the issue of the voluntariness of the confession;

but, if you recall, ladies and gentlemen, he took the stand for. one, one limited purpose: that is, the voluntariness of the confession. I couldn't ask him where he had been and what he had done and whether he committed this crime. In case you are wondering why I didn't that is why. . . ."

Saunders first contends that the foregoing comments violated his privilege against self-incrimination, citing *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] and *Malloy* v. *Hogan* (1964) 378 U.S. 1 [12 L.Ed.2d 653, 84 S.Ct.. 1489], and .that the trial court's refusal to permit his counsel to respond was prejudicial error. Although the trial in this case was concluded prior to the Supreme Court's decision in *Griffin,* the trial judge commendably omitted the then-standard instruction as to the adverse inferences which a jury may draw upon the failure of a defendant to testify in his own behalf. (See *People* v. *Adamson* (1945) 27 Cal.2d 478 [165 P.2d 3].)

A resolution of the issue presented requires that we consider the remarks claimed to be improper in the context in which made. It appears, as the prosecutor indicated, that Saunders' counsel first raised the question· of inferences which might be drawn from the failure to examine Saunders. Counsel's remarks in this regard were as follows: "Is there anything that has been shown you in Mr. Saunders' background which would lead you to believe that he had no redeeming qualities? You saw him testify on the witness stand, although it was in relation to the admissibility of certain confessions. *At that time the District Attorney could have .made certain showings. There were none made.* You know nothing about his background that would lead you to believe that he had no redeeming qualities and that the State should take his life." (Italics added.) The prosecutor's comments can fairly be construed as having been provoked by defense counsel's foregoing improper argument that the prosecutor had failed .to attack Saunders' background while he was on the stand and that as a consequence no showing had. been made that Saunders was without redeeming qualities.

We have heretofore held that a prosecutor is justified in making comments in rebuttal, perhaps otherwise improper, which are fairly responsive to argument of defense counsel and are based on the record. Thus, we deemed it proper for a prosecutor to explain to a jury why the state had not brought earlier criminal charges where his remarks were in refutation of a defense argument that the state had not done so because

it felt that it could not substantiate them—implications not unlike those made by defense counsel in the instant case. (*People* v. *Rosoto* (1962) 58 Cal.2d 304, 364-365 [23 Cal.Rptr. 779, 373 P.2d 867].) We have also declined to characterize as improper a prosecutor's argument that jurors should not continue as residents of their county if they believed defense counsel's assertion that his client had been framed by that county's law enforcement officers. (*People* v. *Rosoto, supra,* at pp. 365-366.)

In the instant case, since defense counsel urged the jury to draw certain inferences from the prosecutor's alleged failure to question Saunders about his background, the prosecutor was entitled to meet such argument. While the latter was not entitled to go beyond the scope of the argument and comment in a manner otherwise proscribed, he cannot be charged with misconduct if his comments only spill over somewhat into a forbidden area; the departure from propriety must be a substantial one. The proper extent to which the prosecutor in the instant case may have gone to rebut the undue advantage gained for Saunders from his counsel's improper remarks is not capable of precise measurement. He was, however, entitled to counter defense counsel's efforts to implant in the jurors' minds the impression that Saunders had redeeming qualities because the prosecutor failed to demonstrate otherwise. We discern no substantial departure from propriety in the prosecutor's response that had he had the opportunity to do so he would have inquired concerning the connotations which might have been attached to names used by Saunders, whether Saunders was sorry and for what purpose Saunders borrowed the car, all of which might reasonably relate to a lack of redeeming qualities.

It appears to us that the response was neither intended nor framed to constitute a direct invitation to draw adverse inferences, was not unduly emphasized, and related to matters on the periphery of the determinative considerations on the penalty phase. Thus, viewing the incident in its totality we are unable to find any undue advantage to the People or disadvantage to Saunders resulting from the exchange between defense counsel and the prosecutor. In the circumstances of this case and in the light of Saunders' criminal propensities, we believe that the error and misconduct complained of, if any, arising out of the prosecutor's comments was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

■■■ We are of the further view, for the reasons heretofore given, that the misconduct complained of, if any, was not substantial, that is, did not constitute a substantial deviation from proper conduct or trial procedures. (See *People* v. *Hines* (1964) 61 Cal.2d 164, 170 [37 Cal.Rptr. 622, 390 P.2d 398] ; *People* v. *Hamilton* (1963) 60 Cal.2d 105, 137 [32 Cal.Rptr. 4, 383 P.2d 412].) Accordingly, it does not constitute a ground for a reversal on the penalty phase of the trial. (*People* v. *Jacobson* (1965) 63 Cal.2d 319, 331-332 [46 Cal. Rptr. 515, 405 P.2d 555].)

Saunders' second claim of misconduct on the part of the prosecutor relates to that portion of the latter's remarks heretofore set out wherein he explains why he could not have examined Saunders as to "where he had been and what he had done and whether he committed this crime." In addition to the foregoing claims of misconduct, Saunders further claims that the prosecutor's remarks constituted an improper implication to the jury that he was in possession of evidence which had not been introduced. (See *People* v. *Talle* (1952) 111 Cal.App.2d 650, 676 [245 P.2d 633].)

No reference is made to additional evidence in the prosecutor's remarks, and they cannot be fairly construed as an implication that the prosecutor was possessed of evidence other than that which had been produced on the penalty phase. ■■■ No misconduct can be charged where the remarks are responsive to defense counsel's argument and do not go beyond the record. (*People* v. *Rosoto, supra,* 58 Cal.2d 304, 364-365.)

Saunders' third claim of misconduct raises issues, the resolution of which are parallel in principle with the issues dealt with in the first and second claims. Misconduct is urged in that the prosecutor argued that Saunders should receive the death penalty because, while in prison under a life sentence, he may constitute a threat to the security of other prison personnel. Counsel for Saunders had earlier argued to the jurors that the People sought the death penalty for Saunders only to make more certain that such penalty would be imposed on Hill; that the jurors should take care to avoid imposing the death penalty, since if they erred they could not correct themselves at a later date. The prosecutor then argued that the death penalty for Saunders was the only proper penalty because Saunders was an unconscionable killer; that he would be among unarmed civilian personnel and other men whose crimes were not crimes of violence; that Saunders "thinks no

more of life than shooting somebody through the heart," and that prison personnel needed protection, presumably from men like Saunders.

Saunders claims that it is prejudicial error to comment on the likelihood that he might kill someone in prison, citing *People* v. *Kirkes* (1952) 39 Cal.2d 719 [249 P.2d 1]. In *Kirkes* the prosecutor was held to have first committed misconduct when he made remarks from which it could be fairly inferred that he had personal knowledge, not based on legitimate inferences from the evidence, of the defendant's guilt. Additional misconduct was assigned for making implications of a further factual matter, not in evidence. This occurred when the prosecutor attempted to explain why a witness for the prosecution had failed to disclose during an eight-year period prior to defendant's apprehension certain knowledge material to the issues. He remarked that the jury could infer that the witness feared for her life as long as defendant was at large. The court held that, as to the latter remark, there was no evidence whatever upon which to base the statement, and that the prosecutor was unjustified in picturing the defendant as a murderer who might kill again to cover his crime. In rejecting the state's claim that the remark was invited by defense counsel's earlier remarks relating to the witness' failure to come forward, the court stated that all of defense counsel's remarks "were permissible inferences from or comments upon the evidence." (39 Cal.2d 719, 725.) *Kirkes* also declares that a prosecutor's misconduct cannot be justified on the ground that defense counsel committed a like impropriety, citing *People* v. *Sampsell* (1950) 34 Cal.2d 757, 765 [214 P.2d 813]. However, as we proceed to explain, in the instant case, unlike *Kirkes,* the prosecutor did *not* commit misconduct.

The People urge that the *Kirkes* case is distinguishable on the ground that the comments there held to constitute prejudicial misconduct occurred during a trial on the issue of guilt, and the views expressed there are not applicable to a trial of the penalty phase. Although different considerations may be involved in determining the prejudicial effect of misconduct as between the guilt and penalty phase of a trial, no reason appears in distinguishing the character of those remarks which may be deemed misconduct for failure of evidentiary support. Nevertheless, the instant circumstances are distinguishable for reasons which follow.

In the present case, at least some of the comments initially made by Saunders' counsel do not find evidentiary support in the record. There is, for instance, no basis for the argument that the death penalty for Saunders was sought only for the purpose of establishing a standard for justifying the death penalty for Hill. In *Kirkes,* defense counsel's remarks were all justified. Moreover, there is nothing in that case which forecloses the prosecutor's right to meet the issues within the scope of the record and defense counsel's argument. (See *People* v. *Mason* (1960) 184 Cal.App.2d 317, 361-362 [7 Cal. Rptr. 627].) In meeting the above argument and the further argument in the instant case that the jurors would be in a ridiculous position if they imposed the death penalty in error, the prosecutor did not depart from the record as in *Kirkes.* ▉ His remarks that Saunders had only a slight regard for life is well justified on the record before the jurors, and it was not misconduct to argue that he would present a continuing hazard to others. (See *People* v. *Talbot* (1966) 64 Cal.2d 691, 712 [51 Cal.Rptr. 417, 414 P.2d 633].) *Kirkes* is not opposed to the conclusions herein because the prosecutor not only confined his arguments to meeting those advanced by defense counsel, but did not depart from the record or commit other misconduct in meeting the issues. (Cf. *People* v. *Sampsell, supra,* 34 Cal.2d 757, 764-765.)

Complaint is also made that the trial court erroneously permitted the prosecutor to both open and close the argument and to make reference to evidence in rebuttal on the penalty phase of the trial. Saunders is joined in this contention by a similar, general contention on the part of Hill. Although the prosecutor has traditionally been entitled to rebuttal on the penalty as well as the guilt phase of bifurcated trials,[7] Saunders claims that the prosecutor took undue advantage of this right, to defendant's prejudice, by arguing for the first time on rebuttal matters not raised by defendant's argument. Defense counsel interposed no objections to the claimed improper comments at the time they were made. At the close of argument counsel objected without noting the specific instances of improper comment and sought to have the remarks stricken or, in the alternative, sought an opportunity to reply. His motion therefor was denied.

The People contend that in a penalty trial the prosecutor,

---

[7] In *People* v. *Bandhauer, ante,* p. 524 at p. 530 [58 Cal.Rptr. 332, 426 P.2d 900], effective well after the instant trial date, we announced prospective rules for the trial on the issues of penalty, insuring equality

on rebuttal, is required to meet the general argument that life imprisonment is the proper remedy, and that he may meet this burden by any argument which demonstrates death to be the proper remedy. Carried to its logical conclusion this would permit the prosecutor to present his entire argument in rebuttal on the penalty phase and accord to the People an undue advantage. Nevertheless, for the most part, the remarks complained of here constitute reasonable and proper response to defense counsel's arguments. Thus, we have already justified the prosecutor's remark, again claimed to be improper, that Saunders presented a threat to prison personnel as a proper response to certain of defense counsel's arguments. We have seen, too, that Saunders' counsel urged that the jurors knew ''nothing about his background that would lead you to believe that he had no redeeming qualities.'' More significant is counsel's challenge that the state demonstrate that Saunders was the one who planned and directed the criminal activities of the group: ''Now, there is no evidence whatsoever that he planned a super crime''; ''I am giving the District Attorney another chance to look through the transcript when he gets up and argues and show you where Mr. Saunders planned this crime''; ''His involvement is minimal—how minimal could an involvement in a murder be?''; ''Again, I would like to see some indication on the record, from the transcript, that Mr. Saunders was the motivating brains behind this operation''; ''You have no evidence that Mr. Saunders was the motivating genius behind this thing.'' Counsel also stated: ''I do not really believe that the District Attorney expects you to bring back the death penalty as to Saunders.''

In response to the foregoing, the prosecutor, in his closing argument, advised that ''we are going to show you that he [Saunders] is the motivating genius.'' Thereafter, he argued, *inter alia*, that it was Saunders who advised Madorid ''We need a third man on this job'' and thus solicited Madorid to participate in a crime which is costing him a life sentence; that Saunders arranged for the automobile; that Saunders provided the gun and bullets of a type which would fragment and were used in shooting Rothman, Wosk and the victim in the earlier liquor store robbery; that Saunders kept the gun in an attache case, from which he removed the gun, checked

in the arguments on each side and providing that hereafter in both the main and rebuttal arguments, the prosecution should open and the defense respond.

its action, and placed it in his belt before going out to make his "collections" on September 16; that Saunders then gave the gun to Hill; that a fragmented bullet of the type provided by Saunders passed through the leg of an earlier liquor store victim; that such a bullet was removed from the body of Rothman with fragments still imbedded; that the deceased Rothman can be deemed to testify "These are the fragments that came from my head. These are the fragments that took my life"; that fragments from such a bullet still remain in Wosk's head; that Saunders is the "motivating genius . . . who is giving all the orders"; that Hill was just a "dummy" or "triggerman" for Saunders who, on observing Hill playing with the gun, stated: "I have to get my boy a cannon."

The prosecutor referred to other evidence which, in total presented a persuasive argument that Saunders was, in fact, the "motivating genius." ■■ Saunders does not complain of all the foregoing remarks, but objects to those remarks going to Saunders' responsibility for Madorid's involvement, the references to the shootings of the victims and the bullet fragments, the imagined testimony of Rothman, the reference to Hill as a "dummy" or "triggerman," and the reference to a cannon for Hill. All of the foregoing can be justified either as proper response to defense counsel's challenge to demonstrate "some indications" that Saunders was the motivating force, or was proper reference to evidence which would lead the jury to believe that Saunders had no "redeeming qualities." The lack of such qualities was also fairly demonstrated by the prosecutor's further remarks that Saunders used a name from a popular television program because he thought it "might sound a little tougher," and that right after the killing Saunders went to a Chinese restaurant, started to flip a coin to see who would pay for the meal, ate not only his but Madorid's meal, and then wanted to go to a night club. If the prosecutor's argument was vigorous and unrelenting, no misconduct can be charged, particularly where it was incumbent upon him to overcome defense counsel's statement that the prosecutor did not really expect the death penalty for Saunders.

■■ The prosecutor did go beyond the scope of proper rebuttal when he started to explain to the jurors the mechanics of an autopsy, as was performed on Rothman. An objection was immediately made and sustained and the prosecutor did not proceed. The prosecutor also stated that Saunders and

Hill "knew if they killed someone they could die and they chose to kill," thus implying knowledge on their part outside of any proper issue on rebuttal. The foregoing, however, is of such minor significance that it could not have contributed to the verdict. (*Chapman* v. *California, supra,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], nor did it constitute substantial error on the penalty phase (*People* v. *Jacobson, supra,* 63 Cal.2d 319, 331-332).

Saunders finally contends that the denial of his motion for a reduction of sentence, following denial of a motion for a new trial, was error for the reason that the trial court failed to give proper consideration to the motion, citing *People* v. *Love* (1961) 56 Cal.2d 720, 728 [16 Cal.Rptr. 777, 17 Cal. Rptr. 481, 366 P.2d 33, 809].

In *Love* the trial court "ruled that it did not have the power to reduce the penalty" (56 Cal.2d 720, 727), and we, quoting from *People* v. *Moore* (1960) 53 Cal.2d 451, 454 [2 Cal.Rptr. 6, 348 P.2d 584], stated: " 'Although the jury in a jury trial has the exclusive power in the first instance to select the penalty for first degree murder as between death and life imprisonment [citations], this does not affect the power of a trial court, in disposing of a defendant's motion for a new trial, to reduce the punishment from death to life imprisonment. Based upon *its own independent view of the evidence,* the trial court is not only empowered to reduce the degree or class of the offense [citations], but is also empowered to reduce the penalty imposed.' " (*People* v. *Love, supra,* 56 Cal.2d 720, 728.) Continuing at page 728 we said: "Thus, the trial court has not only the power to reduce the penalty but the duty to review the evidence and to determine whether in its judgment the weight of the evidence supports the jury's verdict."

In the instant case the trial judge recognized that he had the authority to reduce the penalty independently of his ruling on the motion for a new trial, and he acted upon and denied each motion independently. Although he relied on the resolution of the facts made by the jury as to the penalty imposed, this was not improper as long as he did not rely on that verdict alone and thus shift his responsibility to the jury. (*People* v. *Love, supra,* 56 Cal.2d 720, 729.) Here he indicated that he would intervene if the record, in his judgment, provided some basis for it. He stated: "If there is a question of law involved, if there is a question of some mental deficiency involved here, if I felt the mental state of this defendant was

such that he could not deliberate, could not form the intent to commit the robbery which resulted in the murder, I wouldn't hesitate to overturn the verdict of the jury; *but under the facts of this case I find no justification for disturbing their verdict,* Mr. Sherman, and the motion to reduce the penalty is denied.'' (Italics added.)

The foregoing indicates that the trial judge understood his duty and exercised his independent judgment.

The defendant Hill, declaring himself to be an indigent, contends that the refusal of the court to provide funds for a private psychiatric examination was a denial of due process and equal protection of the law and a violation of Hill's privilege against self-incrimination. The court offered psychiatric assistance under the provisions of Code of Civil Procedure, section 1871. Hill does not contend that proper psychiatric examination could not be had pursuant to section 1871, but rejected the offer on the ground that the results of the examination, by order of the court, would be available to both prosecution and defense.[8]

We have held that there is no constitutional compulsion to maintain as confidential the communications between a court-appointed psychiatrist and an accused where he is represented by counsel. (*In re Spencer* (1965) 63 Cal.2d 400, 408 [46 Cal.Rptr. 753, 406 P.2d 33]; see also *People* v. *Price* (1965) 63 Cal.2d 370, 379 [46 Cal.Rptr. 775, 406 P.2d 55].) In the instant case Hill was offered the assistance of a psychiatrist under conditions which thus complied with constitutional standards, and he cannot be heard to complain because he was denied assistance under other conditions which are not constitutionally compelled. Although the constitutional rights expressly held not to be infringed in *Spencer* were the right of equal protection and the privilege against self-incrimination, no denial of due process appears and Hill advances no basis for his claim that such right is infringed.

Hill next asserts that section 190.1 is unconstitutionally vague, in that it provides no standards for guidance of the jury as to the penalty phase. As pertinent to the contention section 190.1 provides in part that ''Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's

<hr>

[8]Since the trial in this case, the relief sought by defense counsel, that is, the right to psychiatric examination on a confidential basis, has been made available through section 1017 of the Evidence Code, effective January 1, 1967.

background and history, and of any facts in aggravation or mitigation of the penalty. The determination of the penalty of life imprisonment or death shall be in the discretion of the court or jury trying the issue of fact on the evidence presented. . . .''

Section 190.1 places the determination of life or death within the discretion of the trier of fact. (*People* v. *Hines, supra,* 61 Cal.2d 164, 168-169.) The jurors were fully instructed by the court as to the matters which they might consider and the valuations they were required to make in approaching the threshhold of their final judgment. We have heretofore declared that section 190.1 is not unconstitutionally vague. (*People* v. *Seiterle* (1966) 65 Cal.2d 333, 340-341 [54 Cal.Rptr. 745, 420 P.2d 217] ; see also *People* v. *Shipp* (1963) 59 Cal.2d 845, 853 [31 Cal.Rptr. 457, 382 P.2d 577] ; *People* v. *Duncan* (1959) 51 Cal.2d 523, 529 [334 P.2d 858].)

Hill finally claims that it was error to sustain objections, at the penalty phase, to the introduction of (1) a grammar school essay by Hill, and (2) evidence of mental illness in his family. The facts relating to both of these offers were testified to by Hill's mother. She stated, as to the essay, that she had a good relationship with Hill during his grammar school years, and that he had expressed that relationship in the form of an essay. The prosecutor's objection to the offer on the ground that it was remote, self-serving hearsay, and prejudicial beyond its probative value, was sustained.

Mrs. Hill also testified that a daughter suffered from a mental illness. When she was further asked as to the nature of the illness, the prosecutor objected that the evidence would be irrelevant and immaterial. Hill's counsel offered to prove that the sister had been in a mental hospital for two years, and was presently on leave and receiving group therapy treatments. He also offered to prove that one of Hill's younger brothers had been recommended for psychiatric treatment. The prosecutor argued that the question of whether mental illness was hereditary was pure speculation, and the court sustained the objection.

Although section 190.1 broadens the scope of relevant evidence admissible on the issue of penalty, it does not open the trial to incompetent or irrelevant testimony (*People* v. *Terry* (1964) 61 Cal.2d 137, 143-144 [37 Cal.Rptr. 605, 390 P.2d 381]) and preserves the procedural rules (*People* v. *Purvis* (1959) 52 Cal.2d 871, 883-884 [346 P.2d 22]). The offer of the essay in support of Mrs. Hill's testimony, al-

ready of record, that she and Hill had enjoyed a good relationship when he was in grammar school, was properly rejected. The offer was clearly incompetent hearsay, as to which no exception has been suggested. Moreover, it would tend to prove a fact which may have been relevant only a number of years ago, thus rendering it of no or questionable probative value. ▮▮▮ The offer of proof that members of Hill's family were mentally ill was of even less relevancy. Although defense counsel was of the view that the offer was of proper ''background'' material, he did not suggest a specific issue on which it might bear, other than that ''in some people's feelings a mental illness may be something which is hereditary and might have some bearing upon the actions of the defendant in this case.'' However, the offer did not include any testimony which would tend to establish that Hill himself suffered from similar or related illnesses and counsel conceded that the offer was not made to establish that ''this defendant Hill has any mental condition.'' There was no abuse of discretion in the rejection of offers of the essay and proof of the mental illnesses.

The judgments are affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

Appellants' petition for a rehearing was denied May 24, 1967.