Filed 12/16/20  P. v. Curry CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAZZ KAYLENN CURRY,<br><br>    Defendant and Appellant. | C078652<br><br>(Super. Ct. No. 12F00909) |

This case involves a fatal shooting during the commission of an armed robbery by defendant Jazz Curry and codefendant Christopher Compton (not a party to this appeal).  After a joint trial with separate juries, defendant was found guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] and second degree robbery (§ 211).  The jury also found true the robbery-murder special circumstance allegation (§ 190.2, subd. (a)(17)(A)) and

---

[1] Undesignated statutory references are to the Penal Code.

1

the allegation that defendant personally and intentionally discharged a firearm that proximately caused the death of a person (§ 12022.53, subd. (d)). The trial court sentenced him to life without the possibility of parole (LWOP) for murder, plus a consecutive term of 25 years to life for the firearm enhancement and a stayed sentence for the robbery offense. This timely appeal followed.

On appeal, defendant contends reversal is required due to evidentiary error, instructional error, sentencing error, and cumulative error. He contends the statutory scheme authorizing an LWOP sentence under the circumstances of this case is unconstitutionally vague. He adds that the matter must be remanded under Senate Bill No. 620 (2017-2018 Reg. Sess.) (Stats. 2017, ch. 682, § 2) for the trial court to consider whether to strike or dismiss the firearm enhancement. We will remand the matter in light of Senate Bill No. 620, with directions to reimpose sentence on the robbery count, as we explain. We modify the judgment to vacate the sentence on the robbery count, strike the parole revocation fine, and impose the mandatory court facilities and court operations assessments that appear on the abstract of judgment. We otherwise affirm the judgment.

## BACKGROUND

We summarize the pertinent facts in the light most favorable to the judgment. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) Additional information relevant to the claims raised on appeal is discussed below.

*The Robbery and Murder*

In January 2012 Jammell Harris and Larron Peterson lived at the Woodlake Village apartment complex in Sacramento and were friends of defendant and Compton. In late January 2012 defendant and Compton were staying at Peterson's apartment and Joseph Donnell (also known as Joseph Potter, hereafter Donnell) was staying at Harris' apartment. At that time, defendant was 20 years old and lived in Oakland. Compton was 18 years old and lived in Richmond.

2

On January 30, 2012, victim Tralane Thomas, a marijuana dealer, visited his girlfriend, Tangela Rider, at the Woodlake Village apartment complex. Following his arrival, Thomas asked Rider if he could use her cell phone. Shortly thereafter, Rider observed Thomas talking to two African-American males about marijuana. Thomas was sitting in the driver's seat of his car and the two men were standing nearby.[2] Later that same day, Donnell overheard defendant and Compton talking about robbing the man from whom they had just purchased marijuana.

Around 6:00 p.m., Rider noticed that she had missed several calls from a phone number she did not recognize with a (510) area code. When she called that number, the man who answered asked to speak with Thomas. During the ensuing conversation (which Rider overheard because her phone was broken and always on speaker), Thomas agreed to sell the man marijuana. Rider heard two males on the other end of the line. Around 30 minutes later, Rider received another phone call from the same phone number. During that call, the man who had previously called indicated that "they" would be arriving soon and would be waiting for Thomas by his car. As Thomas was leaving Rider's apartment, he told her that he did not know or trust the men he was about to meet but said "he needed to go make some money." He brought his gun with him for protection. According to Rider, Thomas had approximately $1,000 in cash in his pants pockets. The marijuana was in a black bag.

Less than two minutes later, Rider heard yelling and then multiple gunshots. Another Woodlake Village resident heard what he believed to be two gunshots around 7:00 p.m. A few seconds later, he saw an African-American male sprinting toward the back of the apartment complex, followed by a second African-American male, who was also sprinting and carrying a gun that resembled a shotgun. The first man, who was

---

[2] Defendant and Compton are African-American.

around 5'10 with short dreadlocks and a thin build, was wearing a white T-shirt and was between the ages of 20 and 30.[3]

Shortly after the shooting, Rider ran outside and discovered that Thomas had been shot. Rider's roommate called 911.

*The Investigation*

Police officers were dispatched to the scene shortly after 7:00 p.m. Upon their arrival, they found Thomas dead on the ground in the parking lot. A search of the area near Thomas' body revealed three .40-caliber shell casings and a small black plastic bag containing four grams of marijuana. After Thomas was moved, a gold necklace was found in a pool of blood where his body had been. A ring and $68 in cash were in his pants pockets.

When Rider spoke to one of the responding officers, she told him about the phone calls she had received prior to the shooting and provided the caller's phone number-- (510) 408-8617. Around 1:15 a.m., an officer contacted the service provider for that phone number and learned that the phone was located in Harris' apartment. A SWAT team set up a perimeter around the apartment and ordered the occupants to come outside

---

[3] At trial, Rider testified that the two men to whom she had seen Thomas selling marijuana were African-American males with slender builds. She described one of the men (whom she believed to be defendant) as 20 to 23 years old with "a fade" haircut (i.e., short all over), and said that he was wearing a white polo shirt. She also testified that she recognized Compton. When Rider was shown a photographic lineup containing defendant on the day after the shooting, she did not recognize him. However, that same day Rider told a detective that she had watched the news and believed that the person detained by the police at the scene wearing the white T-shirt looked like one of the men she had seen purchase marijuana from Thomas. When the detective testified, he explained that defendant and Harris were the only males detained that day and Harris was *not* wearing a white T-shirt; although the detective did not specifically say that defendant was wearing a white T-shirt, the testimony in context suggests that he was.

4

around 8:38 a.m. Thereafter, defendant, Harris, and Shakiera Carmichael came out of the apartment and were taken to the police station.

That same day, the police interviewed defendant and Carmichael, who was Harris' girlfriend. During his interview, defendant admitted that he was at Harris' apartment the prior evening but claimed he did not know anything about the shooting. He said that he had been inside the apartment the entire night with Harris and Carmichael, and that he had no idea why the SWAT team was at the apartment complex. When Carmichael was interviewed, she explained that defendant, who she knew from "school," was inside Harris' apartment when she arrived around 8:00 p.m., and that no other person entered the apartment until Harris came home at 1:00 a.m. Shortly after her arrival, defendant told her the police were outside because there was a robbery and someone had been shot. Thereafter, she overheard defendant talking on the phone to a male and say, "Yeah, I think he's dead." When asked, Carmichael described defendant's demeanor during this phone call as "bragging." Over the course of the evening, she observed him "sneaking" around the apartment, moving things around in a dresser, and handling bullets. He repeatedly checked the door and looked out the window at the police activity. At one point, he told Carmichael that there had been a homicide and that the police "couldn't leave the body out there." Eventually, defendant admitted that he was involved in the shooting. He explained to Carmichael that he and "Corey" (i.e., Compton, whose middle name is Corey and who is known as Corey Compton or "The Kid") were "fittin' to rob this dude" who "was stupid" and tried to pull his gun out while they were walking up to him. In response, defendant shot the man, "bang, bang." Defendant clarified that the man he shot pulled out his gun in response to Compton's "showing a threat" of a robbery, that is, after Compton began pulling out his gun, which Compton "didn't get . . . all the way out." Defendant noted that the man he shot was "leaking" a lot of blood, and that the man was dead because he had used a special kind of bullet that started with an "H."

5

The police also interviewed Harris and defendant's aunt, Natasha Baker, on the day after the shooting. When asked, they each indicated that defendant's cell phone number was (510) 408-8617. During his interview, Harris explained that defendant and Compton were his "boys from Richmond,"[4] and that they were at his apartment around 6:00 p.m. on the night of the shooting. Harris further explained that he and several others left his apartment around 6:15 p.m. to visit some girls, and that defendant and Compton stayed behind because "they had no place to go, plus [Harris] was expecting a female guest [(Carmichael)] and somebody needed to be there" when she arrived. According to Harris, he returned home around midnight or 1:00 a.m. At that time, defendant and Carmichael were the only people inside his apartment.

When defendant and Harris were placed in the same police interview room on the day after the shooting, Harris told defendant that the police had found several firearms in his apartment, including a shotgun. In response, defendant said, "My shit." Defendant then asked Harris, "They found it?"

A review of cell phone records revealed that Thomas and Rider had each missed two phone calls from defendant's cell phone shortly after 6:00 p.m. on the night of the shooting, and that Rider's phone called defendant's phone at 6:07 p.m. Rider's phone received two additional calls from defendant's phone at 6:27 p.m. and 7:00 p.m.

During a search of Harris' apartment, officers found five firearms, including a Smith & Wesson .40-caliber pistol, a "sawed-off" shotgun, and a .380-caliber pistol. The officers also found multiple loaded magazines, loose ammunition, three cell phones, and $104 in cash. The .40-caliber pistol and the .380-caliber pistol were both loaded and located inside an empty fish tank wrapped in a sweatshirt. It was later determined that

---

[4]  Defendant attended high school in Richmond.

6

one of the cell phones found inside a dresser in Harris' bedroom was assigned the number (510) 408-8617.

An autopsy revealed that Thomas died from two gunshot wounds to the chest, which were fired at close range. He also suffered a third gunshot wound to the back of his left arm.

A firearm expert determined that the shell casings found at the scene were fired by the .40-caliber pistol found in Harris' apartment. The expert also determined that the bullets removed from Thomas' body were consistent with hollow point bullets, which are designed to "promote expansion of the bullet once it hits a target" so that they have "a greater chance of staying in the target" and "dissipat[ing] all of [their] energy within that target."

A fingerprint expert determined that the two latent fingerprints found on the .40-caliber pistol matched defendant's fingerprints.

Approximately two weeks after the shooting, defendant and Compton were placed in a police interview room together. While they were alone, defendant told Compton that the police only had one statement because a "bitch said something." Defendant later said, "I shot that . . . nigga," and told Compton, "Don't worry. I'll take it or I got you."

When Compton was interviewed by the police, he repeatedly claimed that he saw defendant shoot and kill Thomas. According to Compton, the .40-caliber pistol found in Harris' apartment was defendant's gun, and that defendant brought that gun with him to the meeting with Thomas. Compton admitted that he brought the shotgun found in Harris' apartment to that meeting. Compton also indicated that defendant took a gun from Thomas; a "380."

*Compton's Testimony*

Compton testified at trial in front of defendant's jury as follows. Around noon on the day of the shooting, he and defendant met Thomas while they were hanging out at Woodlake Village. Shortly thereafter, defendant purchased marijuana from Thomas. As

7

they were walking away from Thomas, defendant asked Compton if had seen how much money Thomas had and mentioned that they should rob him. Compton did not take defendant seriously until he continued to talk about the robbery (how he would do it and who would participate) and said that he was "fittin' to hit this lick," i.e., commit a robbery.

Around 6:00 p.m., Compton and defendant went to Harris' apartment and retrieved a shotgun. Compton saw defendant with a "Smith & Wesson" at that time. Defendant explained to Compton the plan for the robbery: defendant would call Thomas, set up a meeting to purchase marijuana, and then they would rob Thomas at the meeting. When Compton realized that defendant would not allow him to back out of the robbery, he agreed, out of fear, to carry an unloaded shotgun to the meeting with Thomas.

Shortly before the shooting, defendant called Thomas to arrange the purported drug deal. At that time, defendant and Compton were standing by Thomas' car and Compton was holding a shotgun "[b]ehind [his] leg." As Thomas approached his car, defendant pulled out his gun and reached for the chain around Thomas' neck. At that point, Compton ran away. As he was passing by defendant and Thomas, he saw defendant's gun touching Thomas' chest and heard two gunshots. Thomas screamed after the first gunshot and fell against his car. Compton fled to Harris' apartment and threw the shotgun on the couch. He heard additional gunshots as he ran. Later that evening, defendant called Compton and said, "Dude dead." Compton later learned that defendant had taken a .380-caliber pistol from Thomas. At the time of the shooting, Compton's phone number was (510) 837-0301.

At trial, Compton admitted that he had told numerous lies during his police interview. However, he maintained that he saw defendant shoot Thomas twice in the chest. He also said that he never saw Thomas holding a gun.

8

# DISCUSSION

## I

### *Alleged Evidentiary Error*

Defendant contends the trial court prejudicially erred in overruling a hearsay objection. He argues the trial court should not have allowed a detective to testify that his aunt (Baker) had said his phone number was (510) 408-8617 because the requirements of the past recollection recorded exception to the hearsay rule were not satisfied. We see no abuse of discretion on this record.

A. *Additional Background*

At trial, Baker was called as a prosecution witness. During her testimony (in December 2014), she explained that defendant was her nephew and that she was his primary caregiver for most of his life and "like a mother" to him. When asked, she said she knew defendant's cell phone number in January 2012 but could not recall telling a detective at that time that defendant's phone number was (510) 408-8617. However, she remembered that she told the detective defendant's phone number after she searched through her phone. Baker could not recall the specific number she gave the detective. The defense did not ask Baker any questions.

When the detective subsequently testified, he explained that he interviewed Baker over the phone on the day after the shooting (i.e., January 31, 2012). During that interview, she identified herself as defendant's mother. Thereafter, the prosecutor asked the detective: "And when you interviewed Ms. Baker on the phone, did you ask her for the phone number of Jazz Curry? At that point, defense counsel objected based on hearsay and lack of foundation. Following an unreported sidebar conference, the trial court overruled the objection without further elaboration. The prosecutor then asked: "Detective, when you asked Ms. Baker for [defendant's] phone number, what did she say? In response, the detective said: "(510) 408-8617." The detective mentioned that

9

he wrote a report but was not asked about the content of the report or the circumstances surrounding its preparation.

B. *Applicable Legal Principles*

Hearsay is evidence of an out of court statement offered to prove the truth of the matter asserted therein and is inadmissible unless it falls within an exception to the hearsay rule. (Evid. Code, § 1200.) Evidence Code section 1237 provides an exception to the hearsay rule based on a past recollection recorded. That provision provides:

"(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:

"(1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory;

"(2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made;

"(3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and

"(4) Is offered after the writing is authenticated as an accurate record of the statement.

"(b) The writing may be read into evidence, but the writing itself may not be received in evidence unless offered by an adverse party." (Evid. Code, § 1237.)

" ' "[W]hether an adequate foundation for admission" of a statement under Evidence Code section 1237 has been established turns on whether the declarant's "testimony that [the] statement was true was reliable," and the trial court who hears the declarant's testimony has "the best opportunity" to assess its credibility.' " (*People v. Sanchez* (2019) 7 Cal.5th 14, 41.)

10

"[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception [citation] and '[a] ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto[.]' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.) "A trial court's decision to admit . . . evidence is a matter committed to its discretion ' "and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Geier* (2007) 41 Cal.4th 555, 585, overruled on other grounds in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.) The defendant bears the burden of showing an abuse of discretion. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

C. *Analysis*

We need not address the People's forfeiture argument because we conclude that defendant has failed to show evidentiary error. At trial, Baker was unable to remember defendant's phone number, but knew she had provided it to a detective during her police interview on the day after the shooting. The defense did not cross-examine Baker about any factors that may have affected her truthfulness at the time she spoke with the detective in January 2012. The detective who interviewed Baker mentioned during his testimony that he wrote a report but defense counsel did not ask him any questions as to the content of the report or the circumstances surrounding its preparation. In his reply brief, defendant clarifies that he is not challenging "whether the detective had accurately recorded [Baker's] statement but whether [Baker] had 'testifie[d] that the statement [she] made was a true statement of such fact.' " On this record, which does not include the contents of the unreported bench conference, we cannot conclude the trial court abused its discretion. There was a sufficient basis upon which the court could reasonably have concluded that Baker's conveyance of the phone number to the detective was reliable and the requirements of Evidence Code section 1237 were satisfied.

11

In any event, defendant has failed to show prejudice from the asserted evidentiary error. Setting aside Baker's testimony, there was ample evidence presented at trial to show that defendant's cell phone number was (510) 408-8617 in January 2012. On the night of the shooting, Harris received and placed several calls to that number between 7:22 p.m. and 7:52 p.m. The following day, Harris told the police that defendant's number was (510) 408-8617. Further, the trial evidence showed that the person who arranged the purported drug deal with Thomas called from (510) 408-8617 shortly before the shooting. Compton testified that defendant made this phone call while they were waiting by Thomas' car, and there was evidence that Compton's cell number at the time of the shooting was *not* (510) 408-8617. Any evidentiary error was harmless. (*People v. Parks* (1971) 4 Cal.3d 955, 960-961 [erroneous admission of evidence under this hearsay exception held harmless where other properly admitted evidence supported the same issue].)

II

*Alleged Instructional Error*

Defendant contends the trial court prejudicially erred in failing to instruct the jury that Compton was an accomplice as a matter of law. Anticipating that he may have forfeited this claim by failing to object in the trial court, defendant alternatively argues he received ineffective assistance of counsel. We find no prejudicial instructional error. Therefore, we need not and do not consider defendant's ineffective assistance claim.

A. *Additional Background*

It is undisputed that Compton, Harris, and Donnell testified before defendant's jury and were possible accomplices. It is also undisputed that the trial court and counsel agreed during the reported portion of the discussion on jury instructions that Compton was an accomplice as a matter of law, and that the jury should be instructed accordingly. The parties agreed that the jury should receive CALCRIM No. 335 (Accomplice Testimony: No Dispute Whether Witness Is Accomplice) and CALCRIM No. 708

12

(Special Circumstances: Accomplice Testimony Must Be Corroborated--No Dispute Whether Witness Is Accomplice). However, after closing arguments, the trial court instructed the jury, pursuant to CALCRIM No. 334 (Accomplice Testimony Must be Corroborated: Dispute Whether Witness Is Accomplice) and CALCRIM No. 707 (Special Circumstances: Accomplice Testimony Must Be Corroborated--Dispute Whether Witness Is Accomplice), that Compton was a potential accomplice and that defendant bore the burden of proving Compton was an accomplice.[5] The defense did not object to these instructions. The record does not disclose the trial court's reasoning for its decision to instruct the jury with CALCRIM Nos. 334 and 707 rather than CALCRIM Nos. 335 and 708. However, a review of closing arguments reveals that the prosecutor and defense counsel were aware of the final instructions before making their arguments to the jury, despite the fact that the court instructed after closing arguments.

B. *Applicable Legal Principles*

Section 1111 provides in relevant part: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." "To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.] Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime." (*People v. Avila* (2006) 38 Cal.4th

---

[5] The jury was also instructed, pursuant to CALCRIM No. 301 (Single Witness's Testimony), as follows: "Except for the testimony of [Compton, Harris, and Donnell], which requires supporting evidence if you decide he is an accomplice, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all of the evidence."

13

491, 562-563.) " 'Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." [Citation.]' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 95.)

"An accomplice is 'one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' [Citation.] To be so chargeable, the witness must be a principal under section 31. That section defines principals as '[a]ll persons concerned in the commission of a crime, whether . . . they directly commit the act constituting the offense, or aid and abet in its commission. . . .' [Citation.] An aider and abettor is one who acts with both knowledge of the perpetrator's criminal purpose and the intent of encouraging or facilitating commission of the offense." (*People v. Avila, supra,* 38 Cal.4th at p. 564.)

" ' "Whether a person is an accomplice within the meaning of section 1111 presents a factual question for the jury 'unless the evidence permits only a single inference.' [Citation.] Thus, a court can decide as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are 'clear and undisputed.' " ' " (*People v. Riggs* (2008) 44 Cal.4th 248, 312.) If a witness is not an accomplice as a matter of law, the defendant has the burden to prove, by a preponderance of the evidence, that the witness is an accomplice whose testimony requires corroboration. (*People v. Williams* (1997) 16 Cal.4th 153, 247.)

The Bench Notes to CALCRIM Nos. 335 and 708 advise that a trial court *should not* instruct that the witness is an accomplice as a matter of law when the witness is a codefendant whose testimony includes incriminating statements. Instead, the bench notes indicate that the court should give CALCRIM Nos. 334 and 707, informing the jury that it must decide whether the testifying codefendant is an accomplice. In addition, the court

14

should instruct that if the jury considers this testimony as incriminating evidence against the non-testifying codefendant, the testimony must be corroborated and should be viewed with caution.[6]

C. *Analysis*

Defendant argues the trial court should have instructed the jury with CALCRIM Nos. 335 and 708, under which the court would have directed a finding that Compton was an accomplice as a matter of law. As an initial matter, we note that because Compton's testimony included incriminating statements, the instructions given were in accordance with the advisements set forth in the Bench Notes to CALCRIM Nos. 335 and 708. However, we need not decide whether the trial court committed instructional error because there is ample evidence in the record corroborating Compton's testimony that defendant shot Thomas during a robbery, including defendant's own statements, which renders any inadequacy in the accomplice instructions harmless. (*People v. Williams* (2008) 43 Cal.4th 584, 637-638; *People v. Brown* (2003) 31 Cal.4th 518, 557.) Among other things, the evidence adduced at trial from sources other than Compton showed that defendant admitted to Carmichael on the night of the shooting that he shot Thomas during a robbery in which Compton participated. Further, defendant indicated that he shot Thomas when he spoke with Compton while they were alone together in a police interview room approximately two weeks later. Defendant's fingerprints were found on the murder weapon, which was located the day after the shooting inside the apartment defendant admitted he was in the entire night of the shooting. Rider's testimony about the events she witnessed on the day of the shooting, her cell phone

---

[6] In support of this advisement, the bench notes cite *People v. Hill* (1967) 66 Cal.2d 536 at page 555, which warns: "where a codefendant has made a judicial confession as to crimes charged, an instruction that as a matter of law such codefendant is an accomplice of other defendants might well be construed by the jurors as imputing the confessing defendant's foregone guilt to the other defendants."

records, and the evidence related to defendant's cell phone also corroborated Compton's testimony. Finally, we discern no realistic possibility that the jury failed to find Compton was an accomplice whose testimony required corroboration in light of Carmichael's statements to the police and Compton's testimony. Even the prosecutor conceded that Compton was an accomplice on two separate occasions during closing argument. Because we conclude that defendant suffered no prejudice from the alleged instructional error, we reject defendant's additional contention that the alleged error violated his federal constitutional right to due process of law. (*People v. Williams, supra,* 43 Cal.4th at p. 638.)

### III

### *Cumulative Error*

Defendant contends that the cumulative effect of the asserted evidentiary and instructional errors requires reversal. Having found only one possible instance of nonprejudicial error, and given the overwhelming evidence of guilt that we have described, we disagree. (See *People v. Carter* (2005) 36 Cal.4th 1215, 1281.)

### IV

### *Constitutional Challenge to Sentencing Scheme*

Defendant contends the robbery-murder special circumstance finding must be reversed because the felony-murder offense and the felony-murder special circumstance statutes are unconstitutionally vague. He argues the statutory scheme makes no meaningful distinction between the felony-murder offense and the felony-murder special circumstance when, as here, a defendant is the actual killer who acts without intent to kill during the commission of a felony. Defendant asserts the statutory scheme thus gives prosecutors unfettered discretion to choose whether to charge a felony-murder special circumstance enhancement, and therefore the same crime can result in different penalties, thereby encouraging arbitrary and discriminatory enforcement. Defendant acknowledges that a similar argument was rejected in *People v. Andreasen* (2013) 214 Cal.App.4th 70,

16

79-82 (*Andreasen*), but urges us not to not follow that case.  Alternatively, he raises the constitutional challenge to preserve it for further review.  Because we find *Andreasen* persuasive, we conclude defendant's constitutional challenge is without merit.

"A defendant may raise a substantive due process challenge based on a vague statute that fails to provide reasonable notice or creates a danger of arbitrary application.  [Citations.]  To pass constitutional muster, a statute must be definite enough to provide notice about what conduct is prohibited, and to provide standards for its application and adjudication to avoid arbitrary and discriminatory enforcement." (*Andreasen*, *supra*, 214 Cal.App.4th at pp. 79-80; see also *Williams v. Garcetti* (1993) 5 Cal.4th 561, 567-568.)  Challenges to statues on grounds of vagueness that do not threaten First Amendment interests are examined in light of the facts of the case at hand, and "the statute is judged on an as-applied basis." (*Maynard v. Cartwright* (1988) 486 U.S. 356, 361.)

The penalty for a felony-murder offense is death, LWOP, *or imprisonment in the state prison for a term of 25 years to life*.  (§§ 189, subds. (a), (e), 190, subd. (a), italics added.)  In contrast, the penalty for felony-murder special circumstance is death or LWOP.  (§ 190.2, subd. (a)(17).)

In *Andreasen* the defendant asserted a constitutional challenge to the felony-murder special circumstance enhancement.  He claimed that as applied to an actual killer (who need not have the intent to kill), the felony-murder offense is indistinguishable from the felony-murder special circumstance.  (*Andreasen*, *supra*, 214 Cal.App.4th p. 79.)  The defendant argued that, because the prosecution had unfettered discretion to select the charge, he had no way of anticipating whether he would face LWOP or a sentence with the possibility of parole.  (*Ibid*.)  After reviewing the relevant statutes, the *Andreasen* court concluded that the statutes "provided defendant with notice that if he commits a statutorily-specified felony and kills someone during that felony, he could be subjected to a sentence of 25 years to life with the possibility of parole, [LWOP], or death.  Defendant had notice as to the proscribed conduct and potential punishment.  The mere fact that the

17

prosecution has discretion to select which punishment it will seek does not render a statute unconstitutionally vague or create an improper risk of arbitrary enforcement of a criminal statute." (*Id*. at p. 80.) The court added: "[E]ven assuming arguendo that constitutional due process requires a distinction between the felony-murder offense and the felony-murder special circumstance [citations], there is such a distinction. . . . [T]he felony-murder offense is established merely upon a showing that the defendant killed during the commission or attempted commission of the felony, whereas the felony-murder special circumstance requires an additional showing that the intent to commit the felony was independent of the killing." (*Ibid*.; see *id.* at pp. 81-82 [explaining distinction between felony murder offense and felony-murder special circumstance when the defendant is the actual killer].)

We agree with *Andreasen* and reject defendant's constitutional challenge here. The relevant statutes are not vague as to notice and, contrary to defendant's contention, the prosecutor's discretion to select the charge against a defendant does not render the felony-murder special circumstance enhancement unconstitutional for arbitrary enforcement purposes. (See *Andreasen, supra*, 214 Cal.App.4th at p. 80.) Further, in *United States v. Batchelder* (1979) 442 U.S. 114, 125, the United States Supreme Court observed: "[T]here is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. In the former situation, once he determines that the proof will support conviction under either statute, his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause." (See also *People v. Carter, supra,* 36 Cal.4th at p. 1280.)

## V

### *Senate Bill No. 620*

Defendant contends, and the People concede, that the matter must be remanded under Senate Bill No. 620 for the trial court to consider whether to strike or dismiss the firearm enhancement imposed under section 12022.53, subdivision (d).  We agree.

As relevant here, defendant's sentence included a consecutive term of 25 years to life for personally and intentionally discharging a firearm that proximately caused the death of Thomas.  (§ 12022.53, subd. (d).)  At the time of his sentencing in February 2015, the trial court had no power to strike or dismiss the firearm enhancement.  (See former § 12022.53, subd. (h); Stats. 2010, ch. 711, § 5.)  Effective January 1, 2018, Senate Bill No. 620 amended subdivision (h) of section 12022.53 to provide:  "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.  The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."  (Stats. 2017, ch. 682, § 2.)

In *People v. Woods* (2018) 19 Cal.App.5th 1080, a panel of this court held that Senate Bill No. 620 and the associated amendment to section 12022.53 apply retroactively to nonfinal cases.  (*Woods*, at pp. 1090-1091.)  Consistent with *Woods*, we conclude Senate Bill No. 620 applies to defendant.  Accordingly, we will remand the matter for the trial court to consider whether to strike or dismiss the enhancement.

## VI

### *Fines and Fees*

A.  *Due Process*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, defendant contends that his due process rights were violated when the trial court imposed, without a determination of his ability to pay, a $1,000 restitution fine, a $10 crime prevention

program fine, a $340 main jail booking fee, and a $62 main jail classification fee. He

argues that the matter must be remanded for an ability to pay hearing.[7] We disagree.

In *Dueñas* the Court of Appeal concluded that due process requires the trial court

stay execution of a restitution fine (§ 1202.4) and not impose court operations and court

facilities assessments (§ 1465.8; Gov. Code, § 70373) until it has held a hearing and

determined that the defendant has the present ability to pay. (*Dueñas*, 30 Cal.App.5th at

p. 1164.) We are not persuaded that the *Dueñas* analysis is correct. We join the courts

that have concluded *Dueñas* was wrongly decided.[8] (See, e.g., *People v. Kingston* (2019)

41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 329, review

granted, November 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055,

1067-1068.) As a consequence, we find defendant's reliance on *Dueñas* misplaced. But

even if we assume *Dueñas* was properly decided, it does not compel remand under the

circumstances of this case.

Defendant has forfeited his claim of sentencing error by failing to object in the

trial court. Here, unlike the restitution fine and mandatory assessments involved in

*Dueñas*, defendant had the statutory right to object to the challenged fines and fees based

---

[7] At sentencing, the trial court imposed various fines and fees and ordered direct victim restitution in the amount of $22,999.79. In his reply brief, defendant clarifies that he does not contend direct victim restitution is "subject to an 'ability to pay' finding." Thus, we do not construe his argument on appeal to include a claim that *Dueñas* compels a remand for an ability to pay hearing regarding direct victim restitution. In any event, such an argument would fail on the merits. (*People v. Evans* (2019) 39 Cal.App.5th 771, 777 [declining to extend the rule of *Dueñas* to victim restitution "[b]ased on the significant differences in purpose and effect between victim restitution and the moneys at issue in *Dueñas*"].)

[8] Our Supreme Court is now poised to resolve the question of whether *Dueñas* was correctly decided, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844. Review in *Kopp* is limited to whether courts must consider a defendant's ability to pay in imposing fines, fees and assessments; and, if so, which party bears the burden of proof regarding defendant's inability to pay.

on an inability to pay. (See § 1202.4, subd. (d) [restitution fine in excess of the $300 minimum fine]; Gov. Code, § 29550.2 [jail booking fee and jail classification fee]; 1202.5, subd. (a) [crime prevention program fine].) Our Supreme Court has repeatedly held that when a court imposes fines and/or fees pursuant to statutes that specifically include ability to pay findings, the defendant must raise an objection at sentencing or forfeit the appellate claim that the court failed to make such a finding or there was no evidence of the defendant's ability to pay the imposed amounts. (See, inter alia, *People v. Case* (2018) 5 Cal.5th 1, 52-53; *People v. Trujillo* (2015) 60 Cal.4th 850, 858-861; *People v. McCullough* (2013) 56 Cal.4th 589, 590, 598-599.)

B. *Parole Revocation Fine*

Defendant contends, and the People concede, that the $1,000 parole revocation fine (§ 1202.45, subd. (a)) must be stricken as unauthorized. We agree with the parties.

Section 1202.45, subdivision (a) requires a sentencing court to assess a parole revocation fine "[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole . . ." Here, because defendant was sentenced to LWOP for the murder offense, and his determinate sentence for the robbery offense was stayed, the $1,000 parole revocation fine is unauthorized. (*People v. Carr* (2010) 190 Cal.App.4th 475, 482 & fn. 6; see *People v. McWhorter* (2009) 47 Cal.4th 318, 380, [parole revocation fine cannot be imposed where sentence does not include a period of parole]. Accordingly, we will strike the parole revocation fine.

VII

*Additional Modifications and Corrections Required on Remand*

Although not mentioned by the People, we note that the trial court failed to orally impose the mandatory court operations and court facilities assessment at sentencing, although the fees appear on the abstract. We modify the judgment to add those fees. (§ 1465.8; Gov. Code, § 70373; *People v. Woods* (2010) 191 Cal.App.4th 269, 271-272; *People v. Rodriguez* (2012) 207 Cal.App.4th 1540, 1543, fn. 2 [citing cases, concluding

mandatory court operations and court facilities assessments "may be added on review"].) Further, the trial court purported to impose and stay a three-year consecutive sentence on the robbery count, but "the one-third-the-midterm rule of section 1170.1, subdivision (a), only applies to a consecutive sentence, not a sentence stayed under section 654." (*People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164.) We vacate the three-year sentence and instruct the trial court to select, impose, and stay a full-term sentence on remand.

Further, we have noticed two errors in the abstract of judgment that must be corrected. At sentencing, the trial court imposed a $340 main jail booking fee and a $62 main jail classification fee but the abstract of judgment reflects $340.01 booking and $62.09 classification fees. The abstract of judgment " 'cannot add to or modify the judgment which it purports to digest or summarize.' " (*People v. Mesa* (1975) 14 Cal.3d 466, 471; see *People v. Mitchell* (2001) 26 Cal.4th 181, 185.) The amounts on the abstracts must match those imposed.

## DISPOSITION

The matter is remanded for the trial court to consider whether to strike or dismiss the firearm enhancement (§ 12022.53, subd. (d)) under Senate Bill No. 620 and to select, impose, and stay a full-term sentence for the robbery count; the three-year sentence on that count is vacated. The judgment is further modified to impose a $80 court operations assessment under section 1465.8, and a $60 court facilities assessment under Government Code section 70373 and to strike the $1,000 parole revocation fine (§ 1202.45, subd. (a)).

The trial court shall prepare an amended and corrected abstract of judgment in accordance with this opinion and events on remand, and forward a certified copy thereof to the California Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.


                                          /s/
                                   Duarte, Acting P. J.


We concur:


     /s/
Hoch, J.


     /s/
Renner, J.