Filed 3/19/25  P. v. Marshall CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>REGINA MARIE MARSHALL,<br><br>    Defendant and Appellant. | A167770<br><br>(San Mateo County<br>Super. Ct. No. 20- SF-003150-A) |

A jury found defendant Regina Marshall guilty of three counts of altering or issuing an altered narcotics prescription in violation of Health and Safety Code section 11368.  Defendant raises three claims of error on appeal: (1) the trial court erred in admitting evidence of her statements that police coerced with a promise of leniency; (2) she was wrongly convicted of two counts of forgery based on one prescription; and (3) the court failed to conduct a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).  We affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

In 2014, defendant began seeing Dr. Felix Chen at the San Mateo Orthopedic Medical Group ("medical group") for knee pain.

---

[1]    Additional background facts relevant to the issues raised on appeal are set forth in the Discussion, *post*.

1

All dates described below refer to 2017 unless otherwise indicated.

On April 5, Samantha Oliveira, physician's assistant to Dr. Chen, issued defendant two prescriptions bearing serial numbers 03137 (prescription A) and 03136 (prescription B). Each prescription was for both Norco (hydrocodone) and Dilaudid (hydromorphone) and had a " 'DNF' " (do not fill) date instructing the pharmacy not to fill the prescriptions before those dates. The DNF date on prescription A was April 13; for prescription B, the DNF date was May 13.

On April 11, Oliveira decided to release defendant from her care and wrote defendant a letter to that effect. Consistent with the group's policy to provide a released patient with three months' worth of medication, Oliveira issued a third prescription to defendant with serial number 03034 (prescription C), giving defendant an additional 30-day supply of Norco and Dilaudid, for a total supply of 90 days. Prescription C had a DNF date of June 12. Although the termination letter instructed defendant to come to the medical group to obtain the prescription, the medical group's office manager, Christine De Grazia, mailed both the termination letter and prescription C to defendant by certified mail, and the receipt showed defendant signed for the mail on April 13.

On April 14, prescription A was filled without incident.

**A. First Altered Prescription B at Pacifica Walgreens**

On May 10, defendant presented prescription B to Dr. Veronica Siu, a pharmacist at a Walgreens store in Pacifica. On the prescription, below the DNF date of May 13, there was a handwritten notation that stated, " 'or 28 days.' " Dr. Siu reviewed defendant's file and saw she had last picked up the same medications on April 14. Dr. Siu informed defendant she could not fill prescription B before the DNF date of May 13, and 28 days had not passed

2

since the last time the prescription was filled.  Dr. Siu returned the prescription to defendant, who became angry.  At the time, Dr. Siu did not suspect the " 'or 28 days' " notation was a forgery.

**B. Second Altered Prescription B at Westborough Walgreens**

On May 11, defendant presented prescription B to Dr. Sharon Cheong-Wong, pharmacy manager at a Walgreens in the Westborough neighborhood of South San Francisco.  This time, the DNF date was crossed out, and in addition to the handwritten words " 'or 28 days,' " the prescription included a notation stating, " 'OK to fill,' " with circled initials next to it.  When Dr. Cheong-Wong said she had to call defendant's doctor, defendant became upset.

The medical group informed Dr. Cheong-Wong that defendant's doctor had not crossed out the DNF date.  Dr. Cheong-Wong faxed a copy of the altered version of prescription B to De Grazia, who did not recognize the initials or the handwriting as belonging to someone from the medical group.  Nevertheless, Oliveira authorized Walgreens to fill prescription B two days early.[2]

The medical group decided to discharge defendant as a patient and sent her a letter stating she was "released" from the medical group's care "due to alteration of a narcotics prescription and forg[ing] [a] medical provider's initial, both of which are illegal."  The letter further stated, " 'We are allowing you to fill this 30-day supply of your medication, despite the forgery, to allow a sufficient time to resume treatment by another provider.' "

---

[2]     At trial, Oliveira testified she could not say "what we were thinking" when authorizing the altered prescription B to be filled, but she assumed that it was "probably not worth the argument" and that the medical group did not want to cause defendant to go through withdrawal.

3

## C. Altered Prescription C at Westborough Walgreens

On June 7, defendant presented prescription C to Sheelah Pascual, a pharmacy technician at the Westborough Walgreens. As with the second altered version of prescription B, the DNF date on prescription C was crossed out and the notation " 'OK to fill' " was added, with initials next to it. Pascual brought the prescription to her supervisor, Dr. Cheong-Wong, who did not fill the prescription and instead called the police. Dr. Cheong-Wong also faxed a copy of the altered prescription C to De Grazia, who did not recognize the handwriting or the initials on it.

De Grazia then called other Walgreens pharmacies to investigate whether defendant had submitted altered prescriptions. She received a faxed copy of the first altered version of prescription B from Dr. Siu at the Pacifica Walgreens.

## D. Police Investigation

On June 7, South San Francisco Police Officer Daniel Zhang spoke to Pascual and Dr. Cheong-Wong regarding the altered prescription C. He also spoke by telephone to defendant, who denied altering prescription C and claimed that after Oliveira handed her the prescription, she "took it" back, crossed out the DNF date, "wrote something on it, and handed it back." The following day, Officer Zhang learned about the May incidents involving altered versions of prescription B and spoke again to Dr. Cheong-Wong. He also asked defendant to meet with South San Francisco Police Detective Melinda Lopez.

On July 11, Detective Lopez conducted an in-person, recorded interview with defendant at the police station.

### E. Prosecution and Trial

In February 2022, the district attorney filed an information charging defendant with three counts of insurance fraud (Pen. Code, § 550, subd. (a)(5); counts 1, 3, and 5) and three counts of forging, altering, or issuing an altered narcotics prescription (Health & Saf. Code, § 11368; counts 2, 4, 6).

Defendant moved in limine to exclude evidence of her July 2017 interview with Detective Lopez, arguing her statements to Lopez were coerced and involuntary. After a hearing, the trial court denied the motion.

At trial, De Grazia, Oliveira, Dr. Siu, and Dr. Cheong-Wong each testified they did not make or recognize the handwriting of the cross-outs and notations on prescriptions B and C. Oliveira and De Grazia further testified that prescriptions issued by the medical group were scanned into a patient's file, and that if any handwritten alterations were made, the altered prescription would have also been scanned into the system prior to dispensing the prescription to the patient. There were no scanned versions of prescriptions B and C in defendant's file that matched the altered versions.

Officer Zhang and Detective Lopez testified regarding the police investigation. The video and audio recording of the July 2017 interview between Lopez and defendant was played for the jury, and Lopez gave further testimony regarding statements defendant made after the recording device was turned off.

Defendant testified in her own defense, generally claiming she did not alter the prescriptions and did not recall whether they included the handwritten notations when she received them. Defendant testified that after she noticed the handwritten notations on the first altered version of prescription B, she filed a complaint with the California Department of

5

Consumer Affairs, claiming Dr. Siu or a technician at the Pacifica Walgreens pharmacy was responsible for the alterations. Defendant disputed Detective Lopez's account of the unrecorded portions of the July 2017 interview, which we discuss more fully below.

After the close of evidence, defendant moved for acquittal as to all counts. The trial court granted the motion with respect to the three insurance fraud charges (counts 1, 3, and 5) but denied the motion as to the prescription forgery charges (counts 2, 4, and 6). The jury found defendant guilty of all three prescription forgery counts.

At the sentencing hearing, the trial court denied defendant's request for a continuance. The court suspended imposition of sentence and placed defendant on two years' probation with the condition that she serve 180 days in county jail, with credit for one day served.

## DISCUSSION

### A. Involuntary Confession

Defendant contends her statements during the July 2017 interview with Detective Lopez were inadmissible because she was coerced to cooperate in the interview by Lopez's promise of leniency.

#### 1. *Additional Background*

The following exchange is taken from the transcription of the July 2017 interview between defendant and Detective Lopez.

"[Defendant]: Am I under arrest?

[Lopez]: . . . . You are not. You are not under arrest.

[Defendant]: So, if I didn't answer these questions and I left, what would happen?

[Lopez]: I'll be honest with you. I'm gonna refer this probably to the District Attorney's Office for a warrant for your arrest.

6

[Defendant]:  Okay.  If I did—if I left and didn't answer these questions?

[Lopez]:  Yes.

[Defendant]:  Okay.

[Lopez]:  That—that's for that part.  So, I just—there's a lot that goes on, um with this.  There's options.  There's things we can do.  Okay?  But that relies on honesty.

[Defendant]:  Okay.

[Lopez]:  That's on you.  And your cooperation.  Okay?  But since you did come here, this is the circumstances.  You are free to leave.  You don't have to answer questions but I do have to read you your rights."

Detective Lopez then read defendant her rights under *Miranda v. Arizona* (1966) 384 U.S. 436 and asked whether she wanted to answer some questions.  Defendant responded, "I'm fine answering questions."  Lopez then asked if defendant drove to the police station herself and "of your own free will," and defendant responded, "Yes."  Lopez further asked, "Okay.  I didn't promise you anything or coerce anything to you by coming here?"  Defendant responded, "No."

During the interview, defendant repeatedly denied altering the prescriptions and emphasized that she was a nurse and would never do such a thing, as it would jeopardize her job.  Near the end of the interview, after defendant stated "this destroys my livelihood" and "literally destroys my life," Lopez asked, "Are you comfortable with me turning off the camera and us having an off-camera discussion"?  Defendant responded, "Yes."

At trial, Detective Lopez explained the reason she prompted defendant to have the off-camera discussion was "[b]ecause the fact that her profession was as a nurse, you can see how emotional, distraught she got over this

accusation and what it could do to her career. I thought if she wanted to speak about impact of her career off camera, to have her be more comfortable to freely speak with me about that, then I—because I could see we were done with this going round and round about the prescriptions and their alleged altering. So at that time I was, like, . . . let's just talk like two normal people, not about this and her job."

Detective Lopez further testified that after she stopped the camera, defendant explained "she suffers from depression pretty bad, and in the month prior June of 2017 she had a really a bad week of depression where she wasn't eating, she wasn't bathing, she didn't practically leave her home, and had to call her mother to take her daughter to care for her because she was just not in any state to even perform any motherly functions for that time period. And during that time period, she may have altered the prescription, but she didn't admit that she did do it, but she said she may have and doesn't recall doing it."

In defendant's account, after the camera was turned off, she did not discuss her depression or inability to care for herself beyond explaining her various medications, which included medication for depression. Defendant further testified she recalled Detective Lopez asking if it was possible that she altered the prescriptions during her depression, and defendant "casually" responded, " 'Well, anything is possible, right?' "

In denying defendant's motion to exclude the evidence, the trial court found the interview was "not coercive or improper in any way." The court also commented: "it isn't improper to tell a defendant that being honest can be to his or her benefit. It's quite vague what Corporal Lopez is saying as far, quote, there is options, there's things we can do, but it relies on your honesty.

8

So there is certainly nothing specific as far as promises being made to her and that really isn't, you know, wrong either."

## 2. *Analysis*

"Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial. [Citations.] ' "A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " ' [Citations.] [¶] ' "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence." ' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*).) "In assessing whether statements were the product of free will or coercion, we consider the totality of the circumstances, including ' " 'the crucial element of police coercion,' " ' the length, location, and continuity of the interrogation, and the defendant's maturity, education, and physical and mental health." (*People v. Duff* (2014) 58 Cal.4th 527, 555–556.) " 'On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence.' " (*Linton*, at p. 1177.)

"The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. . . . [¶] When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper. . . . On the other hand, if . . . the

defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible." (*People v. Hill* (1967) 66 Cal.2d 536, 549 (*Hill*); see *People v. Tully* (2012) 54 Cal.4th 952, 993.) " 'No constitutional principle forbids the suggestion by authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence.' [Citation.] Absent improper threats or promises, law enforcement officers are permitted to urge that it would be better to tell the truth." (*People v. Williams* (2010) 49 Cal.4th 405, 444 (*Williams*).)

Defendant contends her statements were coerced because Detective Lopez "plainly promised leniency in return for [defendant's] cooperation." Defendant claims she was initially hesitant to speak with Lopez until the detective clarified that if defendant left the police station without answering questions, Lopez would refer the case to the district attorney, which "confirmed" the "conditional nature" of Lopez's referral for prosecution. Lopez then purportedly "expressly promised alternatives to referral to the District Attorney" by stating there were "options" and "things we can do" if defendant was honest and cooperative.

In support, defendant relies on *People v. Perez* (2016) 243 Cal.App.4th 863 (*Perez*), but that case is distinguishable. In *Perez*, a police officer told the defendant that if he " '[told] the truth' " and was " 'honest,' " then " 'we are not gonna charge you with anything,' " and that " 'you'll have your life, maybe you'll go into the Marines . . . and you'll chalk this up to a very scary time in your life.' " (*Id.* at pp. 866–867.) "Immediately after [the officer] made these statements, [the defendant] responded that he 'd[id] have some information,' and proceeded to confess his involvement in the crimes." (*Id.* at p. 876.)

*Perez* held the confession should have been suppressed because the officer "made an express promise of leniency that was a motivating cause of [the defendant's] confession." (*Ibid.*)

Here, in contrast, Detective Lopez made no express or implied promise that the police or prosecutor would not charge defendant. Nothing in the transcript of the interview reflects a promise of leniency conditioned on defendant's telling the truth, nor on her acquiescing to the interview. Though Lopez did indicate she would refer the matter to the district attorney if defendant left without answering questions, that fell short of an assurance that Lopez would *not* refer the matter to the district attorney if defendant elected to stay and answer questions.

As for Detective Lopez's statement referencing "options" and "things we can do" if defendant was honest and cooperative, the People maintain it falls within the line of authority permitting police to advise a defendant of the benefits that " 'naturally flow from a truthful and honest course of conduct.' " (*Hill*, *supra*, 66 Cal.2d at pp. 549–550 [no implicit promise of leniency in officer's urging accused to "help himself" by confessing]; see *People v. Carrington* (2009) 47 Cal.4th 145, 174 (*Carrington*) [officers "simply informed defendant that full cooperation might be beneficial in an unspecified way"]; *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1203–1204 [no promise of leniency in officers' statement that defendant's cooperation would benefit him during judicial process].) Defendant, however, insists the detective's statement, when viewed in context, suggested the police had alternatives to referring the matter to the district attorney in the event defendant agreed to cooperate, and thus, the statement was at least an implied promise of leniency that motivated her to cooperate in the interview.

We may accept that on its face, Detective Lopez's reference to "options" and "things we can do" went somewhat beyond giving "mere advice or exhortation" that "it would be better for the [defendant] to tell the truth" (*People v. Holloway* (2004) 33 Cal.4th 96, 115) or describing "the moral or psychological advantages to the accused of telling the truth" (*Carrington, supra,* 47 Cal.4th 145, at p. 172).  That said, it remains the case that Lopez's words were nonspecific and vague and, at best, suggested that defendant's cooperation "might be beneficial in an unspecified way" (*id.* at p. 174), which is not prohibited under the law.  We conclude that under the totality of the circumstances, the statement was not a promise of leniency that overcame defendant's will and rendered her statements to Lopez involuntary.

*People v. Falaniko* (2016) 1 Cal.App.5th 1234 (*Falaniko*) is instructive.  There, a police officer repeatedly praised and thanked the defendant for being honest and cooperative and urged that his continued cooperation was in his " 'best interest.' " (*Id.* at p. 1249.)  The officer further told the defendant that "with everything you got going on, the judge is going to look at that and say, you know, that you're being cooperative." (*Ibid.*)  The court held there was no promise of leniency in the "officer's exhortations for honesty and cooperation" or in his "statement that the judge would consider appellant's cooperation" because "such 'brief and bland references . . . do not push this case over the forbidden line of promised threats or vowed leniency.' " (*Id.* at p. 1251.)

We reach the same conclusion here.  Detective Lopez's " 'brief and bland references' " to nonspecific "options" and "things we can do" did not "push this case over the forbidden line of promised threats or vowed leniency." (*Falaniko, supra,* 1 Cal.App.5th at p. 1251.)  The statements came near the start of the interview following polite small talk between Lopez, defendant, and defendant's daughter.  Nothing in the record suggests that

12

the interrogation was unduly prolonged, or that defendant was in a vulnerable state in terms of her maturity, education, or physical or mental condition. Immediately after Lopez made the remarks in question, she reminded defendant, "You are free to leave. You don't have to answer questions," and defendant responded that she was "fine answering questions," that she had come "of [her] own free will," and that Lopez did not promise her anything or coerce her to come to the police station. Without more, Lopez's nonspecific reference to "options" and "things we can do" was not made under circumstances that suggest the remark served to overcome defendant's will.

Moreover, defendant continued to deny responsibility in the face of Detective Lopez's assertions, suggesting her statements did not overcome her will. (*Williams, supra*, 49 Cal.4th 405, at p. 444.) Specifically, despite Lopez laying out incriminating evidence throughout the interview, defendant maintained her innocence and suggested that others at the medical group and the pharmacies had altered the prescriptions. Her continued resistance, "far from reflecting a will overborne by official coercion, suggests instead a still operative ability to calculate [her] self-interest in choosing whether to disclose or withhold information." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 58.)

Considering the totality of the circumstances, we conclude the trial court did not err in concluding Detective Lopez's remarks were not coercive, and on that basis, admitting the evidence of defendant's statements made during the July 2017 interview.

13

**B. Multiple Convictions for Prescription Forgery**

Defendant contends one of her two prescription forgery convictions (counts 2 and 4) must be vacated because she could be convicted of only one count of forgery in relation to prescription B.  We disagree.

Defendant's argument is principally based on *People v. Ryan* (2006) 138 Cal.App.4th 360 (*Ryan*).  There, the defendant was convicted of two counts of forgery under Penal Code section 470 for signing and passing a forged check at an office supply store (counts V and VII), and two more counts of forgery for signing and passing a forged check at an antiques store (counts VI and VIII).  (*Ryan, supra,* 138 Cal.App.4th at p. 364.)  Examining the language, history, and judicial construction of Penal Code section 470, *Ryan* observed that "there was but one crime of forgery, and that the various acts proscribed by the statute were simply different means of committing that offense."  (*Id.* at p. 366.)  Thus, though the defendant "arguably committed separate acts— signing the checks and then uttering them," *Ryan* concluded "she did not, thereby, violate more than one statute, but simply committed acts contained in separate subdivisions of a single statute, all of which were simply different ways of violating that statute."  (*Id.* at p. 369.)  Accordingly, *Ryan* vacated two of the four convictions under Penal Code section 470 so that the defendant was convicted only once for the office supply store incident and once for the antiques store incident.  (*Ryan*, at pp. 371–372.)

We note defendant was not charged or convicted under Penal Code section 470.  But assuming for the sake of argument that the rule articulated in *Ryan* applies to Health and Safety Code section 11368,[3] it would operate to

---

[3]    This statute provides that any person "who forges or alters a prescription or who issues or utters an altered prescription, or who issues or utters a prescription bearing a forged or fictitious signature for any narcotic drug, or who obtains any narcotic drug by any forged, fictitious, or altered

14

prohibit defendant from being convicted of two separate counts for (1) altering prescription B and (2) presenting that same altered prescription to a pharmacist. With that understanding, we conclude the instant case does not run afoul of *Ryan*, as counts 2 and 4 pertained to two *distinct* attempts to pass off *different* altered versions of prescription B to *different* pharmacies, the first in Pacifica on May 10, and the second in Westborough on May 11.

That the same instrument was at the root of both the Pacifica and Westborough incidents does not prohibit multiple counts under *Ryan*. The altered prescription B presented at the Pacifica Walgreens contained one alteration (the addition of " 'or 28 days' "), while the prescription presented in Westborough contained additional alterations, including crossing out the DNF date and adding " 'OK to fill' " along with circled initials. Nothing in *Ryan* suggests that a prescription that has been altered in two different ways, with each altered version presented to a different pharmacy on a different occasion, can support only a single conviction for forgery.

In addition to *Ryan*, defendant relies on the general rule of "one count of forgery per instrument" to support her contention that multiple convictions under Health and Safety Code section 11368 were prohibited. This rule has typically been invoked in cases involving the forging of multiple signatures on a single instrument. (See *People v. Kenefick* (2009) 170 Cal.App.4th 114, 123 [multiple forged signatures on single document constituted one count of forgery]; *People v. Martinez* (2008) 161 Cal.App.4th 754, 762 [falsification of two signatures on single deed of trust constituted only one count of forgery]).

---

prescription, or who has in possession any narcotic drug secured by a forged, fictitious, or altered prescription, shall be punished by imprisonment in the county jail for not less than six months nor more than one year, or in the state prison."

15

But again, those cases do not involve separate presentations of an instrument reflecting different instances of forging.

*People v. Neder* (1971) 16 Cal.App.3d 846 (*Neder*), though distinguishable in a different way from the instant case, is instructive. There, the appellate court held that the presentation of multiple forged instruments in the course of a single transaction constituted separate offenses for each instrument. In so concluding, *Neder* refused to apply the doctrine of *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*)—which requires the aggregation of several takings motivated by one intention into a single offense of theft—to the crime of forgery involving multiple forged instruments in a single transaction. *Neder*'s rationale for treating forgery differently in this regard was that "[t]he real essence of the crime of forgery . . . is not concerned with the end, i.e., what is obtained or taken by the forgery; it has to do with the means, i.e., the act of signing the name of another with intent to defraud and without authority, or of falsely making a document, or of uttering the document with intent to defraud." (*Neder*, at pp. 852–853.) "[C]ourts have consistently followed *Neder* and refused to extend the *Bailey* doctrine to forgery and other nontheft offenses for the reasons articulated by the court in *Neder*." (*People v. Salmorin* (2016) 1 Cal.App.5th 738, 749 [collecting cases].)

In *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*), the Supreme Court held that "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (*Id.* at p. 735.) In so concluding, *Whitmer* clarified and circumscribed the *Bailey* aggregation doctrine, explaining that aggregation was feasible in *Bailey* because "the defendant committed a single misrepresentation and then received a series of welfare payments due to that

16

misrepresentation.  Other than omitting to correct the misrepresentation and accepting the payments, the defendant committed no separate and distinct fraudulent acts." (*Whitmer*, at p. 740, italics omitted.)  But where a defendant commits "a series of separate and distinct, although similar, fraudulent acts," aggregation under *Bailey* does not apply, as "[e]ach fraudulent act was accompanied by a new and separate intent to commit that fraud." (*Ibid.*)

In light of these authorities, and based on the record before us, we conclude multiple convictions were permitted in this case.  As in *Neder*, the alterations and presentations of each forged version of prescription B constituted multiple offenses, and the fact they were committed pursuant to a single overarching scheme to obtain medications under prescription B does not compel their aggregation for purposes of charging and conviction.  And as in *Whitmer*, defendant acted in each instance with a new and separate intent to pass off a uniquely altered version of prescription B to a different pharmacy.  Accordingly, each distinct alteration of prescription B and presentation of that altered version constituted a separate violation of Health and Safety Code section 11368.  On these facts, neither *Ryan* nor the rule of "one count of forgery per instrument" barred defendant's multiple convictions.

## C. *Marsden* Error

Defendant argues the trial court erred in failing to conduct a *Marsden* inquiry upon defendant's requests during trial and at the sentencing hearing.

### 1. *Additional Background*

On the first day of trial, just as the jury was about to enter the courtroom, defendant's court-appointed counsel, Emily Andrews, told the trial court that defendant "has advised me she wants new counsel and wants

to ask for a *Marsden* motion." The court responded that the request was "untimely" and that the court was "not going to deal with it right this moment" because the jury was waiting outside, but that the court would try to determine if there was another judge who was potentially available to hear the motion. Defendant asked the court if she could explain on the record why she made the request, but the court refused, explaining that a *Marsden* motion is "a sealed proceeding outside the presence of everybody except your attorney and court staff." However, the court asked defendant to clarify whether she was "trying to do this because you want to or have hired an attorney or you just want a new attorney from the court?" Defendant answered, "No. My family has offered to help obtain counsel." The court responded, "It's a little late for that, so we'll talk about it in more detail if we need to. But for now, we need to bring the jury in and get started."

Later, during a break in the testimony, the trial court again asked defendant to clarify whether she was bringing a *Marsden* motion or attempting to substitute privately retained counsel. This time, defendant stated she wished to replace appointed counsel because Andrews was "not adequately representing" her. The court said it would try to figure out whether another judge could hear the motion, adding, "But again, given the timing of it, I'll fit it in when I can, but we need to keep moving with the jury."

At the conclusion of the day and outside the jury's presence, the trial court ordered defendant to arrive at 9:00 a.m. "sharp" to address her *Marsden* motion. The next morning, defendant arrived several minutes late, and the court told her the *Marsden* hearing would have to be postponed. The court said defendant would eventually be allowed to make the motion, but "it is more important for [the proceedings] to stay on schedule, and be

18

conscientious of the jurors' time." At the end of the day, the court told defendant to be on time the next morning for the *Marsden* hearing.

The following morning, the trial court asked whether defendant still wished to bring the *Marsden* motion, and Andrews responded, "Apparently she does not wish to proceed, your Honor." The court acknowledged that the motion had been postponed several times, but that "[w]e have now set aside the time," and that this was defendant's opportunity to argue it. Defendant asked whether she could "put on the record why I requested that in the first place and why now I'm withdrawing the request," but the court refused, explaining that the reasons for bringing the motion were "the substance of a *Marsden* motion." "If you don't want to bring one now, there is no need for you to explain why. It's your choice whether you want to bring one now or not, yes or no. Because if you do, we need to get started. The jury is going to be here in about ten minutes."

Defendant responded, "Well, like you, I'm being sensitive to the fact that we brought all these people here as our jurors, and I don't want to waste anyone's time. And for that reason, we're so far into the trial, that I don't want to be wasting anyone's time for not a valid or good enough reason in the . . . Court's or People's opinion. So that's why I just think we should proceed forward and withdraw that motion for the *Marsden*." The court asked whether defense counsel had an opportunity "to discuss those procedures with [defendant]" and whether counsel was "comfortable [defendant] knows what she's doing." Counsel responded, "Yes, your Honor. I didn't know she was going to withdraw it this morning. Again, I'm—I want to make sure she knows that won't be a factor in anything in the future why she wanted to bring it, so if she wants to make that record, she should do it now." The court responded, "Very well. Then we won't have a *Marsden* motion."

19

Following the verdict, at the sentencing hearing, Andrews informed the trial court that defendant "told me this morning that she believes that there is some evidence that she would like me to investigate and look into. Unfortunately, I only have limited information about that at this point as far as potential documents that have been altered, proof of that. [Defendant] thinks that her electronic devices are getting hacked into. She is losing information that she is trying to send me. [¶] We have had a very difficult time communicating to get her prepared for sentencing. We did [meet] yesterday at my office, but it was for a very short time and she feels that—we did talk about a possible *Marsden* motion, but she feels that I am not prepared to proceed to sentencing without knowing more about what she is trying to express to me."

The trial court asked Andrews if she was ready to proceed, and Andrews responded, "In the sense that [defendant] stands convicted, so I am absolutely prepared for sentencing, but I think I'm having a hard time getting [defendant] past the fact that she has been convicted. And so I can't—I have been unable to get a statement from her, but I know that she is prepared to make a statement on her behalf today, but I haven't been able to get—as probation had a struggle with as well, and I guess we could just, sort of, address that in sentencing." Andrews further expressed that in order to do her job effectively, she needed "to address these issues with [defendant]. I don't believe it's a stalling tactic. I think she genuinely believes there is some issues with the evidence that I would ask the Court to give me time to investigate."

The trial court found insufficient good cause for a continuance, concluding defendant's inability to "wrap her mind around the fact that she has been convicted . . . is not a basis to continue the sentencing. And again,

20

there is no concrete reasons being offered, so I don't—it's already been continued a couple of times, or at least once, so the motion to continue is denied."

### 2. *Analysis*

" ' "A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' [Citation.] We review the trial court's denial of defendant's *Marsden* motion under the abuse of discretion standard." (*People v. Orey* (2021) 63 Cal.App.5th 529, 568.) An abuse of discretion is present when a court's ruling is " 'outside the bounds of reason.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 408.)

" 'When a defendant seeks to discharge [their] appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of [their] contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Fierro* (1991) 1 Cal.4th 173, 204.) It is error to deny the defendant the opportunity to explain the basis for [their] claim because a trial court that "denies a motion for substitution of attorneys solely on the basis of [its] courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of [its] discretion to determine the competency of the attorney." (*Marsden, supra,* 2 Cal.3d at p. 124.) "[T]he

standard expressed in *Marsden* and its progeny applies equally preconviction and postconviction." (*People v. Smith* (1993) 6 Cal.4th 684, 694.)

"[T]here is no obligation to initiate the *Marsden* inquiry sua sponte. A trial court's duty to conduct the inquiry arises 'only when the defendant asserts directly or by implication that [their] counsel's performance has been so inadequate as to deny [the] constitutional right to effective counsel.'" (*People v. Leonard* (2000) 78 Cal.App.4th 776, 787, italics omitted.) A trial court is obligated to conduct a *Marsden* hearing "only when there is 'at least some clear indication by defendant,' either personally or through [their] current counsel, that defendant 'wants a substitute attorney.'" (*People v. Sanchez* (2011) 53 Cal.4th 80, 89–90 (*Sanchez*).)

We find no abuse of discretion. It is undisputed that the trial court afforded defendant the opportunity to bring a *Marsden* motion, and that defendant withdrew her request. (See *People v. Jones* (2012) 210 Cal.App.4th 355, 362 [general rule of forfeiture by abandonment applies to *Marsden* motion].) Defendant suggests her decision was influenced by the court's comments causing her to believe the hearing was unimportant and wasteful of the jury's time. It is true that the court's initial reaction to defendant's request was to voice concerns over trial scheduling and the jurors' time. But viewed in context, these concerns were justified by the belated timing of defendant's request, as well as other evidence in the record of defendant's history of dilatory conduct in the proceedings below. (*People v. Smith* (2003) 30 Cal.4th 581, 607 [" 'It is within the trial court's discretion to deny a motion to substitute made on the eve of trial where substitution would require a continuance.' [Citation.] This is even more true if the motion is made during trial" (italics omitted)].) Thus, we do not view the court's comments as exerting an improper or dismissive attitude towards the request so much as

emphasizing the need to maintain the orderliness of the proceedings in light of the timing of the request.

As for the sentencing hearing, we conclude defendant failed to give "at least some clear indication" that she sought to substitute counsel due to perceived inadequate performance. (*Sanchez*, *supra*, 53 Cal.4th at p. 90.) The specific request that Andrews made at the start of the sentencing hearing was for a continuance of that hearing. Though Andrews remarked that she and defendant "did talk about a possible *Marsden* motion," and that defendant did not believe Andrews was "prepared to proceed to sentencing without knowing more about what she is trying to express to me," there was no indication that defendant sought to replace Andrews for inadequate performance at that time.

Meanwhile, the substantive basis for the continuance request was defendant's belief that she had been unable to transmit information to Andrews because her electronic devices had been hacked, and that there was "some evidence that she would like [Andrews] to investigate and look into" with regard to "potential documents that have been altered, proof of that." While Andrews explained she was "having a hard time getting [defendant] past the fact that she has been convicted," Andrews was "absolutely prepared for sentencing." In other words, the trial court was presented not with a direct or implied request by defendant to replace her appointed counsel, but with a request to continue sentencing so that defendant's current counsel could conduct further investigation into evidence that bore on the already-completed guilt phase of trial. On this record, we cannot say the court should have interpreted the continuance request as a request for a *Marsden* hearing sufficient to warrant such a hearing.

23

**DISPOSITION**

The judgment is affirmed.

_____
Fujisaki, J.

WE CONCUR:

_____
Tucher, P. J.

_____
Rodríguez, J.

*People v. Marshall* (A167770)